**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Leonard S. SANDS, et al., Defendants.**

**No. CV 93–7510 JGD.**

United States District Court,
C.D. California.

July 26, 1995.

---

Karen Lynn Matteson, SEC—Securities & Exchange Commission, Los Angeles, CA, Thomas V. Sjoblom, SEC—Securities & Exchange Commission, Washington, DC, M. Catherine Cottam, SEC—Securities & Exchange Commission, Washington, DC, for SEC.

Donald B. Marks, Marks & Brooklier, Los Angeles, CA, Leonard S. Sands, Leonard S. Sands Law Offices, Los Angeles, CA, Tucker K. Trautman, Ireland Stapleton Pryor & Pascoe, Denver, CO, for Sands.

Charles W. Knapp, Los Angeles, CA, Pro Se.

Berrien E. Moore, Playa Del Ray, CA, Pro Se.

Leonard S. Sands, Leonard S. Sands Law Offices, Los Angeles, CA, for First Pacific Bancorp, Inc., PacVen, Inc.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART MOTIONS TO STRIKE CERTAIN AFFIRMATIVE DEFENSES

DAVIES, District Judge.

On July 10, 1995, the following motions were argued: (1) Defendant Sands' Motion for Summary Judgment; (2) Plaintiff's Cross–Motion for Summary Judgment; (3) Plaintiff's Motion to Strike Affirmative Defenses of Defendants Sands, Bancorp, and PacVen; and (4) Plaintiff's Motion to Strike Certain Affirmative Defenses of Defendant Knapp. Having considered the parties' written submissions, and the oral argument of counsel, the Court hereby DENIES Defendant Sands' motion for summary judgment, GRANTS in part and DENIES in part the Plaintiff's motion for summary judgment, GRANTS in part and DENIES in part the motion to strike the affirmative defenses of Sands, Bancorp, and PacVen, and GRANTS the motion to strike certain affirmative defenses of Defendant Knapp.

### FACTS

This civil enforcement action arises from the alleged violation of certain securities laws in conjunction with the management and operation of Defendant First Pacific Bancorp ("Bancorp"). At all relevant times, Defendant Leonard S. Sands was the chairman of the board and chief executive officer of Bancorp. Bancorp is a bank holding company incorporated under the laws of the State of Delaware in July 1981. Sands owned 54.6% of Bancorp's common stock. Prior to August 1990, Sands was director and corporate counsel of First Pacific Bank, Inc. ("FPB"), the sole bank owned by Bancorp. FPB became Bancorp's wholly owned subsidiary in October 1982. FPB was Bancorp's major asset. Sands was also the president and CEO of Defendant PacVen, Inc., a "blank check" corporation incorporated under the laws of Nevada. PacVen was formed for the purpose of merging with or acquiring other companies.

Defendant Charles W. Knapp and Sands were business associates. Defendant Berrien E. Moore was a member of the Bancorp board of directors and an executive vice-president of the Bank.[1] Defendant Daniel S. Geiger was a vice-president of FPB. Defendant Mulc Raj Dass is a citizen of India, and resides in Texas. Defendant Apex Investment Securities, Ltd. was a Panamanian corporation owned by Dass.

Bancorp's stock was publicly traded in the over-the-counter market, except for a period of suspension from June 1989 to April 1990. The Bank was taken over by federal regulators in August 1990.

The Securities and Exchange Commission ("SEC") charges the Defendants with violations of the anti-fraud provisions of certain securities laws. The claims against Defen-

---

1. On April 6, 1994, Defendant Berrien E. Moore and the SEC stipulated to a permanent injunction and final judgment.

dants Bancorp and Sands may be categorized as follows: (1) failure to return funds and disclose material information to investors in connection with stock offerings by Bancorp and PacVen in 1987; (2) improper classification and disclosure of Residual Interest Wrap Notes in financial statements filed with the SEC; and (3) improper booking on Bancorp's financial statements of certain certificates of deposit issued by the Nation Bank of Liberia which were unfunded and uncollectible.

*The Bancorp Stock Offering*

In April 1987, Bancorp commenced a public offering (hereafter, the "Bancorp offering") by filing an amended registration statement and prospectus with the SEC. The prospectus became effective May 14, 1987. The Bancorp offering was underwritten by P.J. Jameson Company, Inc. The amended registration statement provided for a "mini-max" offering. In a mini-max offering, the offering company is required to sell a minimum number of shares on an all or none basis. Once the minimum is reached, the balance of shares are sold on a best-efforts basis.

Bancorp offered a minimum of 750 "units" on an all or none basis. A unit consisted of (1) 500 shares of common stock; (2) warrants to purchase 250 additional shares of common stock; and (3) a 5-year $1,000 convertible debenture at 9¼ percent interest. Each unit was sold for $2,000. Under the terms of the prospectus, Bancorp was required to sell at least 750 units by August 12, 1987. The underwriter had discretion to extend the deadline by 60 days, and did so extend the deadline to October 10, 1987. Proceeds from the sale were to be held in escrow until the requisite number of units were sold. The prospectus stated that if 750 units were sold, i.e. $1.5 million was raised, Bancorp would have the right to sell up to 1,275 units on a best efforts basis. If at least 750 units were not sold within the offering period, the offering would be cancelled and the investors' funds would be returned.

On October 9, 1987, $1,688,000 was forwarded to the escrow agent for investment in the Bancorp offering. Of these funds, $1 million was in the form of a personal check

written by Paul Kutik, and drawn on the Bank of Montreal. This check was later returned unpaid. Bancorp did not sell the minimum number of units by October 10, 1987, and it failed to refund the investors' funds. Sands informed the Federal Reserve Board of San Francisco that the minimum portion of the Bancorp offering had been completed. Bancorp continued with the offering. On December 30, 1987, Sands purchased 500 units, paying $1 million of his own funds. Sands asserts that he acquired Kutik's position when the latter's check was returned unpaid. Of the remaining $688,000 raised in the offering, $500,000 was invested by Trafalgar Holdings, Inc., a company controlled by Defendant Knapp. The parties dispute whether the $500,000 was raised in a public offering conducted by PacVen and indirectly invested by Sands in the Bancorp offering. The remaining $188,000 was raised by personal investors.

On December 31, 1987, Bancorp declared the offering closed. The escrow agent wire transferred $1,688,000, less fees, to Bancorp. The $688,000 acquired from investors other than Sands was never returned to the investors.

*The PacVen Stock Offering*

PacVen was a "blind pool" company which was formed for the purpose of merging with and acquiring existing companies. In April 1987, PacVen engaged in a public offering of common stock. It proposed to "allocate the proceeds from the offering, together with its existing capital, toward seeking, investigating, and acquiring an interest or becoming engaged in a business opportunity." PacVen Registration Statement at 16. The registration statement for the public offering stated:

> All funds not being utilized by the Company for its proposed business will be held in interest bearing accounts or investments in commercial financial institutions until such time as it appears that they will be required.

*Id.* The PacVen offering raised approximately $541,000. On July 27, 1987, PacVen filed with the SEC a Form S-R stating that the proceeds from the 1987 stock offering had been placed in "short term bank and

other deposits." Form S–R at 4. The parties dispute whether the Form S–R misrepresented the actual use of the proceeds. The SEC alleges that PacVen indirectly invested the proceeds in the 1987 Bancorp offering. PacVen did not file a final Form S–R disclosing the disposition of the offering proceeds.

*Residual Interest Wrap Notes*

In 1989, Bancorp acquired $5,618,000 of Residual Interest Wrap Notes ("RIWNs"). Bancorp recorded the RIWNs as assets on its balance sheet. A RIWN was a secondary financing instrument. It was used in the sale of low income apartment projects sponsored by the Department of Housing and Urban Development ("HUD"). The interest on the note accrued over the note's term, but no interest was paid until the underlying property was sold or refinanced. When the property was sold or refinanced, the RIWN was paid, but only if the sale or refinancing yielded sufficient funds to first pay off all primary financing. The value of the RIWN was thus tied to the appreciation of the underlying property.

The RIWNs presented great risk to their owners. The owner was entitled to interest payments at the time the primary financing of the property was extinguished. The RIWNs were not collateralized by the underlying properties. They provided additional leverage on the property to increase equity yield. Bancorp could liquidate the RIWNS only if HUD approved repayment or refinancing of the underlying property. In 1990, HUD instituted a moratorium on such repayments and refinancings.

*The Liberian Certificates of Deposit*

In 1989, Bancorp owned six certificates of deposit issued by the National Bank of Liberia (the "Liberian CDs"). On its balance sheet, Bancorp recorded the Liberian CDs as $3 million in assets. The Liberian CDs were issued to Defendant Apex Investment Securities, Inc. They were not funded when issued. Apex was to lodge the certificates in an account designated by the National Bank of Liberia ("NBL"), at which time the CDs would be funded. NBL informed Bancorp and Sands that it would not honor the Liberian CDs unless they were funded. Bancorp acquired the Liberian CDs in exchange for Bancorp preferred stock.

In December 1989, NBL informed Bancorp that the Liberian CDs had not been funded. Sands and other Bancorp officials received several letters from NBL stating that the CDs would not be negotiated unless funded and that they were "worthless." Nonetheless, Bancorp recorded the Liberian CDs as assets on forms filed with the SEC.

*The Amended Complaint*

On December 13, 1993, the SEC filed this action alleging violations of the anti-fraud and disclosure provisions of numerous federal securities laws. The SEC seeks a permanent injunction prohibiting Defendants from violating said securities laws and requiring disgorgement of unlawful profits.

On January 31, 1994, Defendants Sands and Bancorp filed answers and a cross claim. On March 21, 1994, the Court granted the SEC's motion to dismiss the cross claim against defendants Mulc Raj Dass and Apex Investment Securities, Ltd. The Court found that private parties may not file cross claims against each other in an SEC enforcement action. The Court further granted in part the SEC's motion to strike certain affirmative defenses.

On November 14, 1994, the SEC filed an amended complaint. It elected to do so because of a recent Supreme Court decision that held there is no aiding and abetting liability under Section 10(b) of the Securities and Exchange Act of 1934, and to plead the fraud allegations with particularity. The amended complaint alleges six claims.

Specifically, the SEC alleges the following in the amended complaint: (1) by omitting material facts in the Bancorp offering, Bancorp, Sands, and Knapp directly or indirectly violated Section 17(a) of the Securities Act of 1933 (the "1933 Act") and Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"); (2) PacVen and Sands violated Section 10(b) of the 1934 Act and Rule 10b–5, and PacVen violated Section 15(d) of the 1934 Act and Rules 12b–20, 15d–1, and 15d–13 by filing reports containing materially false and misleading information; (3) PacVen violated Rule 463 of Regulation C under the 1933 Act

by failing to file Supplemental Reports on Form S–R; (4) PacVen and Sands violated Section 13(b)(2)(A) of the 1934 Act by failing to maintain accurate books and records; (5) Sands violated Sections 13(d) and 16(a) of the 1934 Act and Rules 13d–2 and 16a–3 by failing to file Amended Schedules 13D and Form 4; and (6) Bancorp and Sands violated Section 10(b) of the 1934 Act and Rule 10b–5, Bancorp violated Section 13(a) of the 1934 Act and Rules 12b–20 and 13a–13, and Sands violated Section 20(a) of the 1934 Act, by making materially false and misleading statements in periodic reports involving the RIWNs and the Liberian CDs.

On February 24, 1995, Defendant Sands filed a motion for summary judgment. The motion was continued because the SEC requested additional time to conduct discovery on the issue of scienter. On May 22, 1995, the SEC filed a motion to strike certain affirmative defenses. On May 23, 1995, the SEC filed a cross-motion for partial summary judgment. It seeks summary judgment on the first, third, fifth, and sixth claims.

### DISCUSSION

### I. Defendant Sands' Motion for Summary Judgment

#### A. *Summary Judgment Standard*

The Federal Rules of Civil Procedure provide for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court clarified the standard for summary judgment in three important cases. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson,*

477 U.S. at 256, 106 S.Ct. at 2514. Whether a fact is material is determined by looking to the governing substantive law; a fact is material if it may affect the outcome of the suit. *Id.* at 248, 106 S.Ct. at 2510. If the moving party seeks summary adjudication with respect to a claim or defense upon which it bears the burden of proof at trial, its burden must be satisfied by affirmative admissible evidence. By contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54; *see also* Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial §§ 14:123–141 (1995).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. Rule 56(e). Summary judgment will be entered against the non-moving party, when appropriate, if that party does not present these specific facts. *Id.*

In assessing whether the non-moving party has raised a genuine issue, its evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14 (citing *Adickes v. S.H. Kress and Company,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nonetheless, "the mere existence of a scintilla of evidence" is insufficient. *Id.* at 252, 106 S.Ct. at 2512. As the Court explained in *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. at 1355–56:

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

### B. *The Remedies Sought Are Proper*

Sands argues that he is entitled to summary judgment because the equitable relief sought by the SEC is improper. In the prayer for relief, the SEC requests the Court to (1) find that the Defendants violated certain sections of the 1933 Act, the 1934 Act, and rules promulgated thereunder; (2) permanently restrain and enjoin the Defendants from further violations of securities laws; (3) order Defendant Sands to disgorge all profits received and losses avoided as a result of the securities laws violations; and (4) permanently prohibit Defendant Sands from acting as an officer or director of any securities issuer. Complaint at 29–31.

#### 1. *Disgorgement is a Remedy*

The SEC seeks an order requiring Sands to disgorge all profits earned and losses avoided as a result of the securities violations alleged in the complaint. When ordered by a court in a securities action, disgorgement is designed to deprive the defendant of his "ill-gotten gains and prevent unjust enrichment." *Hateley v. SEC*, 8 F.3d 653, 655 (9th Cir. 1993).

In response to Sands' first set of interrogatories, the SEC asserts that it seeks to recover $500,000 that PacVen raised in a public offering and indirectly invested in the Bancorp offering. The SEC further requests that the Defendants disgorge the $188,000 invested by the public in the Bancorp offering. Def.Exh. 2 at 49.[2] Sands argues that he earned no profits as a result of the alleged securities violations. The complaint does not even allege that Sands personally profited from the allegedly unlawful actions. Motion at 6. He further argues that the Supreme Court has eliminated the SEC's implied remedy of disgorgement, and statutes expressly providing for such a remedy cannot be retroactively applied to the instant action.

■ The SEC has met its burden of showing that whether Sands obtained any "ill-gotten gains" from the 1987 offering by FPB is a triable issue of fact. In order to seek disgorgement as a remedy, the SEC must show that Sands profited from the transaction or avoided losses "as a result of the illegal conduct." Complaint at 31. The terms of the Bancorp mini-max offering required Bancorp to raise a minimum of $1.5 million from bona fide purchasers or be required to return to investors all funds raised. SEC Exh. 2 at 20. Bancorp attempted to raise between $1.5 million and $2.55 million to enable the corporation to reorganize and eliminate FPB's capital impairment. Bancorp Prospectus, Def.Exh. 20 at 173. Sands owned 54.6% of Bancorp, and was its largest shareholder. *Id.* at 21. Sands thus stood to avoid losses if FPB was able to raise funds in the 1987 offering sufficient to enable it to reorganize and continue to operate.

■ Sands correctly asserts that the SEC has the burden of proving at trial that he profited through the Bancorp offering. In moving for summary judgment, however, Sands has the burden of producing admissible evidence showing that he earned no profits and avoided no losses as a result of the Bancorp offering. The SEC has met its burden by showing that Bancorp raised $688,000 in the offering. Sands, on the other hand, has produced no evidence in support of his assertion that he neither profited nor avoided losses in the Bancorp offering. As Bancorp's majority shareholder, he stood to avoid losses by raising capital for Bancorp. Whether Sands avoided any losses or realized some profit in the Bancorp offering is an issue to be determined at trial. Sands has not shown that the remedy is unavailable as a matter of law.

Nor is Sands correct in asserting that the Supreme Court has determined that disgorgement is unavailable in private actions arising under the securities laws. In *Central Bank of Denver v. First Interstate Bank of Denver*, —— U.S. ——, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Court held that private litigants may not assert a claim for aiding and abetting under Section 10(b) of

---

**2.** Defendant Sands' Exhibits are attached to the Statement of Uncontroverted Facts and Conclusions of Law filed concurrently with the motion for summary judgment. Page numbers refer to the cumulative pages in the package of exhibits.

Exhibits filed by the SEC in opposition to Sands' summary judgment motion are attached to Plaintiff's Rule 56 Statement of Facts Genuinely In Dispute, filed March 15, 1995.

the Exchange Act, 15 U.S.C. § 78j(b). The *Central Bank* decision does not "renounce[ ] the once predominant view that courts may invoke whatever rights and remedies they deem appropriate to effectuate the purposes of the securities laws." Motion at 8. The Court did not address the issue of remedies or overrule its prior decisions that provide federal courts with the power to award appropriate relief, including disgorgement, when the defendant violates a federal statute. *See Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 69, 112 S.Ct. 1028, 1035, 117 L.Ed.2d 208 (1992) (upholding district court's imposition of an equitable remedy so long as it is presented with a violation of a federal statute).

### 2. *Injunctive Relief is not Barred as a Matter of Law*

The SEC seeks an order enjoining the Defendants from violating the securities laws. The SEC also requests the Court to prohibit Sands from acting as an officer or director of any issuer of securities required to file certain reports under the 1934 Act. Complaint at 31.

■ Section 21(d)(2) of the 1934 Act provides that "[w]henever it shall appear to the [SEC] that any person is engaged or about to engage in acts or practices constituting a violation of any provision of the chapter," or the rules promulgated thereunder, it may bring an action in district court to "enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond." 15 U.S.C. § 78u(d)(1). A district court may prohibit the defendant from "acting as an officer or director of any issuer" of a class of securities as defined by the statute if the defendant's conduct "demonstrates substantial unfitness" to serve as an officer or director. 15 U.S.C. § 78u(d)(2).

Sands contends that it would be improper for the Court to bar him from serving as an officer or director or enjoin him from future violations of the securities laws. The SEC has not shown that Sands is engaged or likely to engage in further violations. The requested relief is also impermissibly overbroad.

As Sands points out, in order to obtain injunctive relief the SEC has the burden of showing he is reasonably likely to violate the securities laws in the future. *SEC v. Murphy,* 626 F.2d 633, 655 (9th Cir.1980). The fact that the defendant is not currently engaged in securities violations does not preclude an injunction. In predicting the likelihood of future violations, the court looks to the totality of the circumstances surrounding the defendant and his violations. Factors to be considered include (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; and (5) the sincerity of the defendant's assurances against future violations. *Id.*

■ The Court cannot find as a matter of law that injunctive relief is unavailable in the instant action. As described below, the SEC has produced evidence sufficient to find that Sands operated with the requisite intent to constitute a violation of the securities laws. The evidence is that over a two-year period Bancorp and Sands filed numerous forms with the SEC that contained material misrepresentations. The SEC has produced evidence that Sands misrepresented the value of Bancorp's assets while he was an officer and director of that corporation. The evidence supports a finding that Sands was attempting to preserve his investment in Bancorp.

Sands' present status at Bancorp and PacVen is unclear. He may be able to commit future violations, as there is no evidence that he is unable to resume operation of Bancorp or PacVen. This is true given that Sands exhibits no remorse and denies acting in bad faith. He makes no assurances against future violations. The SEC bears the burden of proving the likelihood of future violations of the securities laws. It has produced evidence sufficient to survive summary judgment and present such evidence at trial.

### C. *Scienter*

■ The final argument in support of Sands' motion for summary judgment is that he acted in good faith. Sands argues he did

not possess the requisite scienter to support a finding that he violated the securities laws. To establish liability under the 1934 Act, a plaintiff must show the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1424 (9th Cir.1994) (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976)). Scienter must be shown in actions brought by the SEC seeking injunctive relief. *Aaron v. SEC*, 446 U.S. 680, 691, 100 S.Ct. 1945, 1953, 64 L.Ed.2d 611 (1980). A defendant in a securities law case is entitled to summary judgment if no reasonable jury could find that the defendant acted with the requisite scienter. *Worlds of Wonder*, 35 F.3d at 1412.

The SEC charges Sands with, *inter alia*, violations of section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), and section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), for omitting material facts in connection with the Bancorp mini-max offering. As evidence of scienter, the SEC alleges Sands (1) knew the Bancorp mini-max offering would not close, and $188,000 in investor funds would have to be refunded, unless he invested in the offering; (2) decided to use the PacVen offering proceeds to finance the Bancorp mini-max offering; (3) knowingly allowed the Bancorp mini-max offering to close when $1.5 million of the funding was obtained from non-bona fide purchasers; and (4) caused all or a portion of the proceeds raised in the PacVen offering to be "downstreamed" to FPB in order to improve the bank's capital to asset ratio. Complaint, ¶ 37.

### 1. Disclosure of Sands' $1 Million Investment

■ Sands invested $1 million of borrowed funds in Bancorp in order to fund the 1987 offering. Sands characterizes the SEC's complaint as objecting to the fact that Sands failed to disclose that he had invested his own funds in the Bancorp offering. Motion at 22. He responds by stating that the lawyers and other professionals involved in the 1987 offering were informed that he invested his own funds. Sands later submitted "the appropriate filings concerning [his] invest-

ment" when concerns were raised as to full disclosure. *Id.* at 23.

The SEC, however, objects to more than mere non-disclosure. Under the terms of the prospectus issued with the mini-max offering, Bancorp was required to sell $1.5 million in Bancorp units to bona fide purchasers. A sale to a control person such as Sands in not "bona fide." *In re F.D. Roberts Securities, Inc.*, SEC Rel. No. 34-26389, 42 S.C.C. Docket 694 (Dec. 22, 1988). Thus, the offering failed, and Bancorp was required to return the investors' funds. SEC Exh. 2 at 122. Sands and Bancorp committed fraud and rendered the prospectus materially false by not returning investors' funds when Bancorp did not raise $1.5 million from bona fide sales. Sands' failure to disclose the investment is only one aspect of the alleged securities violations. Op. at 9 n. 7.

As further evidence of scienter, the SEC has produced evidence of Sands' failure to properly disclose to the SEC and other investors his $1 million investment in the Bancorp offering. When Sands purchased $1 million of the $1,688,000 in securities issued in the 1987 offering, he was required to file a Form 4 with the SEC within 10 days. 15 U.S.C. § 78p(a). This document would inform the SEC that his stake in Bancorp had increased. The offering closed on December 30, 1987, SEC Exh. 3, but Sands did not file a Form 4 until September 1989. Def.Exh. 8. Further, Sands did not file Bancorp's 1988 annual reports until April 16, 1990. Said report disclosed Sands' $1 million investment in Bancorp. SEC Exh. 27.

On May 3, 1989, A. Randall Thoman, a Bancorp accountant, wrote a memorandum addressing the allowance for loan losses relative to loans classified by FDIC examiners. The memorandum states that on May 2, 1989, Sands first informed the accountants that he had purchased some of the units sold in the Bancorp offering. Sands purchased the units when he determined that the offering would be terminated unless he did so. SEC Exh. 54 at 28. Sands stated that he did not know if he had filed a Form 4 in connection with his purchase of the securities. Jehu Hand, an attorney representing FPB, stated that the transaction required the filing

of a Form 4, but that "for some time, we didn't know that [Sands] had bought the units." *Id.*

Rowland W. Day is the attorney who represented the underwriter in the 1987 Bancorp offering. He also represented PacVen in its 1987 stock offering. Day asserts that Sands did not inform him that he invested his own funds into the Bancorp offering, and never sought Day's advice regarding disclosure of the investment. SEC Exh. 55 at 31. Day contradicts Sands' statement that all lawyers and professionals were aware that Sands invested $1 million of his own funds in the offering. As evidence of Sands' scienter, Day asserts that "Sands could not have relied on my advice in failing to disclose . . . that he buttressed the Bancorp offering with $1 million he invested personally, as he never sought my advice on these matters." *Id.* at 32. Thus, the issue of whether Sands unlawfully avoided disclosing the use of his own money to fund the Bancorp offering presents a triable issue of fact.

### 2. *PacVen's Acquisition of Bancorp Securities*

■ The complaint alleges that on October 9, 1987, PacVen, at Sands' direction, transferred $500,000 of its offering proceeds to 109 Wilshire Corporation, a company controlled by Charles Knapp. In exchange, Trafalgar Holdings, Inc. ("Trafalgar"), also controlled by Knapp, issued to PacVen an unsecured note for $500,000. Knapp invested PacVen's $500,000 in the Bancorp mini-max offering. Complaint, ¶ 30. Sands thus "indirectly" invested an additional $500,000 in the Bancorp offering.

The SEC contends that PacVen violated the securities laws when it transferred $500,-000 to Knapp and said funds were invested in the Bancorp offering. This was an unauthorized use of PacVen's offering proceeds. PacVen did not disclose the transfer or the investment in forms filed with the SEC. Instead, PacVen made the "materially false and misleading statement" that PacVen had loaned the proceeds to an unrelated party. Complaint, ¶ 45.

Sands argues that he did not cause PacVen's offering proceeds to be used to fund the Bancorp offering. Sands contends that the SEC can provide no evidence that Knapp's investment in the Bancorp offering was inconsistent with legitimate business purposes. Nor can it support the allegation that Knapp and Sands conspired to "funnel" PacVen's proceeds into Bancorp. Motion at 25–26. Sands suggests that PacVen purchased a promissory note from Trafalgar in a transaction contemporaneous with, but unrelated to, Knapp's investment in the mini-max offering. The SEC "simply assumes the worst" because both transactions were in the amount of $500,000. *Id.* at 26.

PacVen raised approximately $541,000 in a public offering conducted in May and June of 1987. Def.Exh. 22. The prospectus issued by PacVen required PacVen to hold the funds raised in the offering in an interest bearing account or in investments in "commercial financial institutions" until they could be used to finance mergers between PacVen and other companies. Instead, PacVen used the funds to purchase a short term note from Trafalgar in October 1987. Def.Exh. 24. The use of the funds thus violated the terms of the prospectus. SEC Exh. 58 at 41. PacVen's Form S–R, filed with the SEC in August 1990, states that funds raised by PacVen were placed in short term bank and other deposits. SEC Exh. 59 at 44. As discussed below, Sands made material misrepresentations on the Forms S–R filed with the SEC.

The SEC has produced handwritten notes taken by Robert Johnson in a meeting with Sands, Knapp, and four other men involved in a potential merger between PacVen and Paperulers, Inc. The merger was agreed upon in 1988 but never consummated. Def. Exh. 10. In the meeting, Sands stated that the funds that purchased the note issued by Trafalgar were used to purchase FPB stock. SEC Exh. 15 at 39–40. That PacVen used the funds raised in its stock offering to purchase Bancorp securities is also supported by a May 5, 1989 memorandum written by A. Randall Thoman. The memorandum states that Bancorp's accountants did not know that Sands had personally invested in the Bancorp offering until he prepared the 1987 Form 10–K. SEC Exh. 14 at 34–35. The SEC has met its burden of showing that

whether Sands used the $500,000 PacVen loaned to Trafalgar to indirectly purchase Bancorp securities is a triable issue of fact.

### 3. *The Liberian CDs and RIWNs*

█ The sixth cause of action alleges securities laws violations arising from Sands' and Bancorp's disclosure and improper booking of certificates of deposit issued by the National Bank of Liberia ("Liberian CDs") and Residual Interest Wrap Notes ("RIWNs"). The SEC charges Sands with making materially false statements regarding the RIWNs and Liberian CDs in Bancorp's 1989 10–K and March 10–Q reports filed with the SEC. The false statements allegedly constitute violations of section 13(a) of the 1934 Act, 15 U.S.C. § 78m(a), and Rules 12b–20 and 13a–13 promulgated thereunder.

Apex Investment Securities, Inc. ("Apex") acquired 40 certificates of deposit from the government of Liberia. The majority of the CDs were deposited with FPB which acted as an escrow agent. Subsequently, Bancorp purchased six of the CDs from Apex. The six CDs had a face amount of $3,000,000. Apex purchased 100 shares of Bancorp preferred stock in exchange for the Liberian CDs. Def.Exhs. 36–37. At issue is whether the CDs had any value and whether Sands, in financial disclosures filed with the SEC, misrepresented the way the CDs were acquired, booked, and valued.

Sands argues that at all times he acted in good faith. He believed that the Liberian CDs and RIWNs were valuable instruments.[3] Sands and Bancorp "took affirmative steps to assure themselves that the CDs had been properly and validly issued by the NBL," and were informed that the Liberian CDs were purchased by Apex for good consideration. Motion at 27–28. In June 1990, Sands was informed of the results of an investigation into the CDs conducted by the Federal Reserve Bank. The Federal Reserve stated that the CDs sold to Apex were not issued in connection with an actual deposit of funds in the NBL. They were created to be sold by Apex and "funded" after such sales were complete. The NBL did not honor its obligations and the CDs thus had no value. Def.Exh. 43 at 397. Sands contends that when he learned the CDs had no value, Bancorp wrote off the CDs on its books within eight days. Motion at 28, Def. Exh. 44.

The evidence, however, supports a finding that Sands knew the CDs were unfunded as early as December 1989. In a letter written by the Deputy Governor of the National Bank of Liberia to First Pacific Bank, FPB was informed that it should contact Apex to negotiate funding of the CDs. It was clear that the CDs were unfunded and that the National Bank of Liberia had not warranted that funding would occur. SEC Exh. 20. On December 13, 1989, FPB wrote to Apex regarding ways to "facilitate the funding of the Certificates of Deposit." SEC Exh. 21. The SEC asserts that Sands had been informed that the CDs were unfunded when he visited Liberia on December 7 and 8, 1987. SEC Supplement, ¶ 14.

On January 17, 1990, the NBL wrote to Apex expressing frustration in the fact that the CDs had not yet been funded. Apex had informed the NBL that payment instructions were issued in November 1989. The Liberian bank requested Apex to return its original certificates because the January 15, 1990 deadline for funding the CDs had expired and "it [was] quite apparent [Apex was] unable to arrange the funding of the[ ] Certificates." In a letter dated April 5, 1990, the NBL informed Sands that it would not honor the CDs. They had not been funded as required by an agreement entered between Apex and the NBL when the Liberian CDs were issued.

Bancorp filed a 1989 Form 10–K on April 16, 1990 that included the CDs as assets. SEC Exh. 28 at 71. The booking of the CDs as assets was an apparent attempt to ignore the high probability that the CDs had no value and could not be collected. Sands' signature does not appear on the 10–K. But it is undisputed Sands was a controlling person of Bancorp as defined in 15 U.S.C.

---

3. The SEC has produced evidence sufficient to survive summary judgment relating to both the Liberian CDs and the RIWNs. Since the evidence of unlawful acts pertaining to either "asset" is enough to deny Sands' motion, the following discussion pertains to the Liberian CDs only.

§ 78t(a). Whether Sands intentionally misrepresented the value of the Liberian CDs on the Form 10–K is a triable issue of fact.

## II. Plaintiff SEC's Cross Motion for Partial Summary Judgment

In its cross-motion for summary judgment, the SEC moves for partial summary judgment on the following claims: (1) Claim 1, based on the fact Sands and Bancorp did not refund the money invested in the mini-max offering even though Bancorp failed to sell the minimum number of units of Bancorp stock; (2) Claim 3, because PacVen violated Rule 463 of Regulation C when PacVen did not file an interim and final supplement to its Form S–R following the 1987 stock offering; Claim 5, because Sands failed to file a Form 4 with the SEC when he used his own funds to purchase securities in the 1987 Bancorp offering; and Claim 6, based on the fact that Bancorp filed reports with the SEC which contained false and misleading statements regarding the value of the RIWNs and Liberian CDs.

### A. *Claim 1: Failure to Refund Money to Investors*

The SEC moves for summary judgment against Sands and Bancorp on the first claim. The first claim charges the Defendants with securities fraud for failing to refund investors' funds. This rendered materially false the prospectus issued with the 1987 Bancorp mini-max offering.

The SEC alleges violation of section 17(a) of the 1933 Act, 15 U.S.C. § 77q(a), and Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and rules 10b–5 and 10b–9 promulgated thereunder. These sections prohibit use of "any manipulative or deceptive device or contrivance" in the purchase, offer, and/or sale of securities in interstate commerce. Rule 10b–5, 17 C.F.R. § 240.10b–5, prohibits in connection with the purchase or sale of any security the employment of any "device, scheme or artifice to defraud," the making of any "untrue statement of material fact," and any act that "operates or would operate as a fraud or deceit upon any person."

Rule 10b–9 prohibits the making of a misrepresentation in connection with a mini-max offering. It requires the issuer in such an offering to adhere to disclosures in the prospectus. The rule states in relevant part:

(a) It shall constitute a "manipulative or deceptive device or contrivance," as used in section 10(b) of the Act, for any person, directly or indirectly, in connection with the offer or sale of any security, to make any representation:

. . . .

(2) To the effect the security is being offered or sold on any other basis whereby all or part of the consideration paid for any such security will be refunded to the purchaser if all or some of the securities are not sold, unless the security is part of an offering or distribution being made on the condition that all or a specified part of the consideration paid for such security will be promptly refunded to the purchaser unless (i) a specified number of units of the security are sold at a specified price within a specified time, and (ii) the total amount due to the seller is received by him by a specified date.

17 C.F.R. § 240.10b–9.

■ The 1987 Bancorp offering was a "mini-max" offering. A mini-max offering is an underwriting arrangement designed to reduce risk to investors. It requires the sale of a minimum number of shares or units by the offering company on an all or none basis. Once the minimum is reached, the balance of shares or units are sold on a best-efforts basis.

The prospectus stated that Bancorp would refund investor funds if Bancorp did not sell the minimum 750 units, and raise the minimum $1.5 million, by August 12, 1987. SEC Exh. 1 at 166.[4] As of that date, the 750 minimum units had not been sold, so the underwriter extended the offering period to October 10, 1987. The SEC contends Sands and Bancorp committed fraud when they did not sell the minimum number of units by the

---

4. The exhibits cited in support of the SEC's motion for summary judgment are attached to the Statement of Uncontroverted Facts and Conclusions of Law.

deadline and did not return the investors' funds.

The Bancorp 1987 offering was conducted on a "best efforts, all or none basis" for the first 750 units, and a "best efforts basis" thereafter, up to the maximum 1,275 units. The prospectus stated:

If 750 Units are not sold within 90 days (which may be extended an additional 60 days in the Underwriter's discretion) from the date hereof, all monies received will be refunded without commissions or deductions for expenses, and without interest.

Prospectus at 2; SEC Exh. 1 at 185. Proceeds from the offering were to be held in escrow until the requisite units were sold. If the requisite units were not sold within the offering period, the offering would be terminated and the investors' money would be refunded. If the minimum number of units were sold, the funds were to be transferred to Bancorp, and the remaining units, up to 1,275, would be sold on a best efforts basis. *Id.*

The SEC argues Sands and Bancorp violated securities laws because (1) Sands knew the Bancorp 1987 offering was on an all or none basis; (2) Sands knew as of October 10, 1987, Bancorp had neither sold the minimum number or shares nor collected the minimum amount of funds; and (3) Sands knew the investors' funds were not refunded.

 It is a violation of the anti-fraud provisions of the securities laws to attempt to make an offering appear successful when the required number of shares have not been sold. The defendant's purpose in doing so is to defeat the refund of monies paid by investors. *C.E. Carlson, Inc. v. S.E.C.*, 859 F.2d 1429, 1434 (10th Cir.1988) *Reh'g denied*, 859 F.2d at 1438. Proof of scienter sufficient to establish violations of section 17(a) of the 1933 Act and section 10(b) of the 1934 Act may be shown through conduct that carries a danger of misleading purchasers such that the defendants knew or must have known of its propensity to mislead. In a mini-max offering, scienter is shown by the defendant's knowledge of the "all or none" provision, and that the funds were retained even though the minimum amount was not raised through public sales. *Id.* at 1435–36.

 The Court makes no finding as to whether the PacVen offering proceeds were directed to Bancorp. As stated above, this issue presents a triable issue of fact. As to the $1 million purchase by Sands, however, it is undisputed that the funds were invested by Sands while he was a corporate insider. Sands was an officer and director of Bancorp when he invested the funds necessary to reach the minimum amount in the 1987 Bancorp offering. Although a check for $1 million was written by a Mr. Kutik, drawn on the Bank of Montreal, this check was returned unpaid. SEC Exh. 57. Sands and Bancorp have produced no evidence that the requisite funds were raised prior to the October 10, 1987 deadline. Sands purchased $1 million of Bancorp units on December 30, 1987, the date the offering closed. Bancorp failed to sell the minimum number of units by the date specified in the prospectus. Bancorp thus should have refunded the $688,000 of invested funds.

Sands argues a triable issue of fact can be found in the confusion over the date by which the funds had to be raised. The precise date, however, is of little significance. Even if on October 10, 1987 Sands had no knowledge that the requisite funds had not been raised, he did know that the minimum number of units had not been sold in November 1987 when the $1 million check was returned. *See* SEC Exh. 57. The investors' funds were not returned at that time or any time thereafter. Accordingly, Sands and Bancorp violated section 17(a) of the 1933 Act, section 10(b) of the 1934 Act, and Rules 10b–5 and 10b–9 promulgated thereunder.

B. *Claim 3: Failure to Comply with Regulation C*

 The third claim in the amended complaint charges PacVen with failure to file supplemental reports on Form S–R. Complaint, ¶ 53. Said supplemental forms are required by Rule 463 of Regulation C under the 1933 Act. The forms require (1) a description of the use of offering proceeds by category and (2) any material variance between actual use of the offering proceeds and

the intended use stated in the prospectus. 17 C.F.R. § 230.463.

PacVen completed a stock offering on July 27, 1987. It filed a registration statement, signed by Sands, on January 27, 1987. SEC Exh. 26. The registration statement became effective on April 17, 1987. It stated that all funds not being utilized by PacVen for its proposed business would be held in "interest bearing accounts or investments in commercial financial institutions until such time as it appears that they will be required." *Id.*

Rule 463 of Regulation C requires PacVen to file a Form S–R within 10 days after the first three month period following the effective date of the registration statement. Here, PacVen was required to file a Form S–R on or before July 27, 1987. The SEC informed PacVen of its duty to file the Form S–R. Def.Exh. 65. Rule 463 further requires PacVen to file an additional Form S–R every six months thereafter, and a final Form S–R upon the later of "application" of the offering proceeds or "termination" of the offering.

PacVen filed an initial Form S–R on July 27, 1987. It stated that the funds raised in the PacVen offering, approximately $541,000, were temporarily invested in "short term bank and other deposits." SEC Exh. 27 at 242. PacVen filed no subsequent S–R Forms, and concedes it did not file said forms. PacVen has disclosed to the SEC neither the final disposition of the 1987 offering proceeds nor the interim disposition of the proceeds.

PacVen argues that it has been inactive since November 1988, and thus has not disposed of the proceeds in a way that requires filing of subsequent Forms S–R. PacVen refers to a Form 15 filed with the SEC on August 12, 1987. It further contends that at all times it acted in good faith by entrusting the filing of forms to its attorneys.

PacVen, however, has not shown that it was exempt from filing Forms S–R at six month intervals starting on July 27, 1987. The Form 15 PacVen filed with the SEC contains certification and notice of termination of registration under the 1934 Act. It provides information relevant to the trading of PacVen securities. The Form S–R, which PacVen did not file, arises under the 1933 Act and requires disclosure of the use of capital raised in public offerings and information about the raising of the capital.

PacVen has produced no evidence that it was entitled to cease filing interim Forms S–R. PacVen had the obligation to inform its shareholders of the status of their investment. Rule 463(a), 17 C.F.R. § 230.463. Further, even though the parties dispute how the funds raised by PacVen were applied, it is undisputed that PacVen did not file a final report when the funds were invested. Accordingly, the SEC is entitled to judgment on the third claim.

C. *Claim 5: Failure to File Amended Schedule 13D and Form 4*

■■■ The fifth claim in the amended complaint charges Sands with failure to amend his beneficial ownership statement on Schedule 13D or Form 4. Complaint, paras. 62–64. Sands was a beneficial owner of more than five percent of Bancorp. Section 13(d) of the 1934 Act, 15 U.S.C. § 78m(d), and Rule 13d–2, 17 C.F.R. § 240.13d–2, required Sands to inform the SEC within ten days of (1) his plan to purchase additional Bancorp securities in the Bancorp mini-max offering; and (2) the increase in his ownership of Bancorp securities resulting from said purchase. *See* 15 U.S.C. § 78m(d)(2).

Section 16(a) of the 1934 Act, 15 U.S.C. § 78p(a), required Sands, who owned more than ten percent of Bancorp, to file a statement with the SEC disclosing his ownership at the close of each calendar month and such changes in ownership that occurred during that month. As an officer and director of Bancorp, Sands was also required to report to the SEC within ten days whenever he purchased additional Bancorp shares. 15 U.S.C. § 78p(a). Such beneficial ownership statements were to be filed with the SEC on a Form 4.

Sands owned 54.6% of Bancorp's stock prior to the 1987 Bancorp offering. Bancorp 1987 Offering Prospectus, SEC Exh. 1 at 211. Sands purchased 500 units in the offering. He spent $1 million. This constituted more than one percent of Bancorp. SEC

Exh. 12 at 91. The increase in ownership by an amount greater than one percent constituted a "material" acquisition and required Sands to file with the SEC an amendment to the Schedule 13D. 17 C.F.R. § 240.13d–2(a). The Defendants argue that a Schedule 13D amendment is not required unless the purchaser increases his net position, relative to all outstanding shares, by more than one percent. This argument is unpersuasive. Section 13(d) imposes a duty on a person who owns more than five percent of a company issuing stock. When such an owner acquires, by absolute number, an additional one percent or more of the issuer's stock, he must disclose to the SEC the acquisition. It is the amount of stock purchased, not the affect on the purchaser's ownership percentage, that triggers the reporting requirement. *See* 15 U.S.C. § 78m(d)(1)(D).

Sands did not amend the Schedule 13D and disclose his purchase of the 500 units in the Bancorp offering. He did not report a material change in his ownership of Bancorp stock. Sands thus violated 15 U.S.C. § 78m(d)(2). Nor did Sands file a timely Form 4 disclosing the change in beneficial ownership. Sands was an officer and director of Bancorp at the time he purchased the 500 units in the Bancorp offering. He was required under section 16(a) of the 1934 Act to file a Form 4 by January 9, 1988, 10 days after purchasing additional Bancorp shares. He filed a Form 4 on September 11, 1989. SEC Exh. 7.

The Court hereby finds that Sands violated sections 13(d)(2) and 16(a) of the 1934 Act by not filing an Amendment to his Schedule 13D, and by not timely filing a Form 4, respectively. The SEC is entitled to judgment on the fifth claim in the amended complaint.

### D. Claim 6: the RIWNs and Liberian CDs

As discussed above, whether Bancorp and Sands filed with the SEC materially false and misleading reports regarding the RIWNs and Liberian CDs is a triable issue of fact. Having carefully reviewed the SEC's moving papers, and the documents filed in support thereof, the Court finds the SEC has not met its burden on the sixth claim. Accordingly, the motion for partial summary judgment on the sixth claim is DENIED.

### III. Motions to Strike Affirmative Defenses

On December 2, 1994, Defendants PacVen, Bancorp, and Sands filed separate answers to the amended complaint. The answers set forth the identical eighteen affirmative defenses. On December 12, 1994, Defendant Charles W. Knapp filed an answer in which he set forth 12 affirmative defenses. On December 16, 1994, the SEC moved to strike eleven of the affirmative defenses brought by Defendants Bancorp, PacVen, and Sands, and all of the affirmative defenses brought by Defendant Knapp. The motions were denied without prejudice to be renewed following discovery responses that were then outstanding. On May 22, 1995, the SEC again moved to strike the affirmative defenses asserted by Bancorp, PacVen, and Sands. In a separate motion filed on the same date, the SEC moved to strike Defendant Knapp's affirmative defenses.

### A. The Standard

 Rule 12(f) of the Federal Rules of Civil Procedure provides that the court, upon motion or sua sponte, "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." To strike an affirmative defense, the moving party must convince the court "that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed." Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial § 9:381 (1995) (quoting *Systems Corp. v. American Telephone & Telegraph,* 60 F.R.D. 692, 694 (S.D.N.Y.1973)). The grounds for the motion must appear on the face of the pleading under attack or from matter which the court may judicially notice. *Id.* at § 9:403.

 As a general proposition, motions to strike are "regarded with disfavor because [they] are often used as delaying tactics, and because of the limited importance of plead-

ings in federal practice." *Id.* at § 9:375; *accord* 5A Wright & Miller, Federal Practice & Procedure § 1381 (2d ed. 1990). Accordingly, courts often require a showing of prejudice by the moving party. Schwarzer at §§ 9:376, 9:407; Wright & Miller at § 1381. The Ninth Circuit has stated that prejudice can arise from allegations that cause delay or confusion of the issues. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir.) *rev'd on other grounds,* —— U.S. ——, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994) (district court could properly strike lengthy, stale and previously litigated factual allegations in order to streamline action). Even when the defense under attack presents a purely legal question, courts are reluctant to determine disputed or substantial questions of law on a motion to strike. Wright & Miller at § 1381.

B. *Affirmative Defenses Asserted by Bancorp, Sands and PacVen*

The SEC moves to strike the following affirmative defenses: the third (unclean hands), the fourth (estoppel and waiver), the sixth and ninth (failure to plead fraud with particularity), the seventh (ratification and estoppel), the thirteenth (accord and satisfaction), the fourteenth (arbitration and award), and the sixteenth (laches).

1. *Affirmative Defense Three: Unclean Hands*

 As the third affirmative defense, Defendants allege the SEC's action is barred by the doctrine of unclean hands. Some courts have stated that the doctrine of unclean hands may not be invoked against a governmental agency acting in the public interest. Others have declined to strike the defense on the theory that the Government's conduct, if it is so outrageous as to cause constitutional injury, may preclude equitable relief. *See, e.g., SEC v. Keating*, Fed.Sec.L.Rep. (CCH) ¶ 96,906, 1992 WL 207918 (C.D.Cal.1992) (Wilson, J.). In any event, the defendant must show such egregiousness that "the resulting prejudice to defendant rises to a constitutional level." *SEC v. Musella*, 38 Fed. R.Serv.2d 426, 428, 1983 WL 1297 (S.D.N.Y. 1983).

Discovery is complete. Despite numerous opportunities to do so, the Defendants have produced no evidence that the SEC acted unconstitutionally in prosecuting this action. The unsupported allegations in the Defendants' response to interrogatories are frivolous. The unclean hands affirmative defense is stricken.

2. *Affirmative Defense Four: Waiver and Estoppel*

 In the fourth affirmative defense, the Defendants allege the SEC "tacitly approved all alleged conduct," and therefore waived its claims and is estopped from asserting them. In the Ninth Circuit, estoppel is available against the SEC where the government's wrongful act would cause serious injustice, and where the public interest would not be unduly harmed by imposition of the doctrine. *Mukherjee v. Immigration and Naturalization Service*, 793 F.2d 1006, 1009 (9th Cir.1986).

 On the face of the complaint, the Defendants assert a viable estoppel and waiver defense. The Court should not weigh the evidence for purposes of a motion to strike an affirmative defense. The Defendants allege that the SEC approved of certain registration statements filed by Bancorp, failed to warn Defendants about certain fraudulent transactions, and accepted the Defendants' Wells submissions. Given the high standard, the SEC has not met its burden of showing that the fourth affirmative defense should be stricken.

3. *Affirmative Defenses 6 and 9: Failure to Plead Fraud with Particularity*

 In the sixth and ninth affirmative defenses, the Defendants allege the amended complaint fails to plead scienter and fraud with the particularity required by Fed. R.Civ.P. 9(b). The assertion that the complaint fails to plead scienter and fraud with particularity is an attack on the pleading. It normally provides the grounds for a motion to dismiss. The allegation that the complaint does not state fraud with particularity is not an affirmative defense on which the Defendants will produce evidence at trial. Accordingly, the sixth and ninth affirmative defenses are stricken.

#### 4. *Affirmative Defense 7: Ratification and Estoppel*

■ The seventh affirmative defense is based on the Defendants' submission of a "Wells" report to the SEC. A Wells submission is a document filed with the SEC in which a defendant presents the evidence and legal theories he believes the SEC should consider in deciding whether to file an enforcement action. Defendants allege their Wells submission attempted to "answer[ ] unequivocally all questions raised" in the instant action. The SEC did not promptly respond to the Wells submission. In fact, Defendants did not hear from the SEC until it filed the complaint. The Defendants argue the delay prejudiced the Defendants and should bar and estop the SEC from pursuing this action.

The SEC was under no obligation to accept the assertions and arguments presented by Defendants in the Wells submissions. It did not accept those arguments, and filed the complaint. Defendants cannot estop the SEC from pursuing the instant enforcement action because it considered and rejected the Wells submissions. The seventh affirmative defense is stricken.

#### 5. *Affirmative Defense Thirteen: Accord and Satisfaction*

■ The thirteenth affirmative defense Defendants raise is "accord and satisfaction." An accord and satisfaction is the "substitution of a new agreement for and in satisfaction of a pre-existing agreement between the same parties." *Red Alarm, Inc. v. Waycrosse, Inc.,* 47 F.3d 999, 1002 (9th Cir.1995). The SEC argues that the Court should strike this affirmative defense because there is no evidence that the SEC offered, and Defendants agreed, to settle the action.

■ Defendants claim that on or about February 19, 1993, Defendant Sands entered into an accord and satisfaction with the Federal Reserve Board ("FRB"). The SEC is thus barred from bringing the instant action because it is based on the same transaction that was the subject of the accord and satisfaction with the FRB. Defendants implicitly argue that the SEC may not pursue an action which the FRB settled because the SEC

and FRB are interrelated agencies. Because the impact of the alleged accord and satisfaction between the FRB and the Defendants is disputed, the Court will not strike the thirteenth affirmative defense.

#### 6. *Affirmative Defense Fourteen: Arbitration and Award*

■ The fourteenth affirmative defense Defendants raise is for "arbitration and award." The SEC contends that it has never participated in arbitration proceedings with Defendant Sands, and that "by no stretch of the imagination" has either party received an award. Neither of the parties has produced evidence relating to an arbitration. The Court finds that the SEC has not met its burden in demonstrating that the Court should strike this affirmative defense.

#### 7. *Affirmative Defense Sixteen: Laches*

■ The sixteenth affirmative defense Defendants raise is laches and undue delay on the part of the SEC. It is well established that laches is not an affirmative defense against the United States. *Costello v. United States,* 365 U.S. 265, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961). The laches defense is therefore stricken.

#### C. *Affirmative Defenses Asserted by Defendant Knapp*

The SEC filed a separate motion to strike certain affirmative defenses asserted by Defendant Knapp. Defendant Knapp has filed no opposition. In addition, the affirmative defenses at issue have already been stricken in previous orders by the Court. Accordingly, the Court hereby orders stricken from Defendant Knapp's answer the third, fourth, fifth, sixth, eighth, ninth, and eleventh affirmative defenses.

#### CONCLUSION

For the foregoing reasons, Defendant Sands' motion for summary judgment is DENIED. The SEC's motion for summary judgment is GRANTED in part and DENIED in part. Judgment is granted for the SEC on the first, third and fifth claims in the

amended complaint. There is a triable issue of fact as to the sixth claim. The appropriate remedy is also an issue to be determined at trial.

The following affirmative defenses are ordered stricken from the answers filed by Defendants Bancorp, PacVen, and Sands: the third (unclean hands), the sixth and ninth (failure to plead fraud with particularity), the seventh (ratification and estoppel), and the sixteenth (laches). The third, fourth, fifth, sixth, eighth, ninth, and eleventh affirmative defenses are ordered stricken from the answer filed by Defendant Knapp.

IT IS SO ORDERED.