Robert **FREEDMAN**, on behalf of himself and all others similarly situated, et al., Plaintiffs,

v.

**LOUISIANA–PACIFIC CORPORATION,** et al., Defendants.

Civ. No. 95–707–JO.

United States District Court, D. Oregon.

Feb. 14, 1996.

N. Robert Stoll, Steven Douglas Larson, Timothy S. DeJong, Stoll, Stoll, Berne, Lokting & Shlachter, P.C., Portland, OR, Max W. Berger, Steven B. Singer, Bernstein, Litowitz, Berger & Grossman LLP, New York City, for Plaintiffs.

Douglas M. Ragen, Miller, Nash, Wiener, Hager & Carlsen, Portland, OR, Daniel E. Loeb, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C., William F. Martson, Jr., Barbee B. Lyon, Jeanne M. Chamberlain, Zachary W.L. Wright, Tonkon, Torp, Galen Marmaduke & Booth, Donald J. Willis, Jill S. Gelineau, Schwabe, Williamson & Wyatt, Garr M. King, Joseph C. Arellano, Kathryn M. Pratt, Kennedy, King & Zimmer, Portland, OR, for defendants.

ROBERT E. JONES, Judge:

This action is brought by several Plaintiffs who purchased Louisiana–Pacific ("L–P")

common stock during the period from October 19, 1993 through May 24, 1995. Plaintiffs assert the following two claims: Defendants [1] allegedly violated sections 10(b), 15 U.S.C. § 78j(b), and 20(a), 15 U.S.C. § 78t(a), of the Securities Exchange Act ("Act"), as well as Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated by the Securities and Exchange Commission ("SEC").[2] This case is before this Court on Defendants' Motions to Dismiss and Strike (# 41, # 43, # 52, # 58),[3] and Plaintiffs' Motion for Class Certification (# 45).

## SUMMARY OF ALLEGATIONS

Between 1980 and 1995, L–P manufactured and marketed a product called oriented strand board ("OSB") which is composed of compressed wood panel products arranged in layers and bonded with resins and adhesive. This product was used to make siding that was designed to replace ordinary plywood siding. L–P warranted the OSB siding for 25 years. In addition, between 1989 and 1994, L–P obtained approval ratings from the American Plywood Association ("APA") [4] for its OSB siding, by allegedly falsifying OSB samples submitted to the APA. Plaintiffs claim that both the L–P 25–year warranty and the approval ratings from the APA bolstered sales of the OSB siding, even though, in fact, the siding was defective because it absorbed moisture and deteriorated rapidly.

Plaintiffs further allege that L–P knew or recklessly disregarded that the OSB siding was defective, based upon the following events. First, in 1991, the State Attorney General for Minnesota brought an action claiming that the siding was defective, which L–P settled. Second, also in 1991, the Miller Paint Company in Portland sent a letter to L–P discussing problems with the OSB siding, and then followed up in 1992 with a similar letter. Third, by 1992, L–P paid $22 million in warranty claims for OSB siding. Fourth, from 1989 through 1994, L–P obtained APA approval of the OSB siding by sending falsified samples to the APA. From

---

1. "Defendants" includes all defendants in the action: L–P, Merlo, Eisses, Paul, and Hebert. However, "Individual Defendants" refers only to Merlo, Eisses, Paul and Hebert. The individuals are officers of L–P.

2. Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—* * *
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5 adds:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 20(a) reads:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

3. Defendants refer to their motions as "motions to dismiss"; however, to the extent that Defendants seek only to strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," they shall be construed as "motions to strike" under Fed. R.Civ.Pro. 12(f), instead of "motions to dismiss" under Fed.R.Civ.Pro. 12(b)(6).

4. The APA is a non-profit trade association whose member mills produce approximately 80% of the structural wood panel products manufactured in the United States. The APA sets performance standards for panel products, as well as rates the quality of products submitted to the organization. This rating may accompany the product when it is released for sale.

these incidents, Plaintiffs conclude that L–P knew or recklessly disregarded by the early 1990s that its OSB siding was defective.

Despite having actual or constructive knowledge of the problems with the OSB siding, L–P allegedly failed to disclose that knowledge when it issued statements regarding the financial health of the Company. For instance, L–P announced that record sales and earnings in 1993 were, in part, due to "[L–P's] emphasis on innovative, affordable building materials made from plentiful, non-controversial timber sources * * *." Compl. ¶ 79 (quoting statement by Defendant Merlo). Furthermore, L–P filed its 1993 Form 10–K with the SEC on February 4, 1994 explaining that OSB siding was a strong performer which contributed to record sales and earnings in 1993. The next month, on March 1, 1994, L–P issued its annual report to shareholders which noted the following: (1) L–P's stock price increased over 38%, in part, as a result of affordable building materials, and (2) the demand for OSB siding was increasing and L–P would continue to construct more OSB plants. L–P concluded that report by predicting that "conditions look good for a continuation of L–P's strong performance." Compl. ¶ 83 (quoting the March 1, 1994 Annual Report to Shareholders). After these announcements, L–P stock increased from $30 per share up to $48 per share.

In addition to L–P's own statements regarding the OSB siding and the Company's health, Plaintiffs allege that favorable predictions by analysts were based on misleading information provided by L–P. For example, on October 23, 1993, an analyst from Paine-Webber, Inc. upgraded L–P to "attractive" from neutral because the OSB siding products were very popular and L–P was significantly expanding its capacity to make OSB. Similarly, on February 1, 1994, an analyst from Black and Co. predicted that L–P stock would earn $3.56 per share in 1994, in part, from the success of OSB products. Lastly, an analyst from Duff & Phelps stated on October 24, 1994 that L–P had a strong market position in lumber and structural panels, based upon information received by L–P. Plaintiff contends that L–P was re-sponsible for these statements because it provided information to those analysts but failed to disclose that OSB siding was defective.

Problems regarding the siding began to publicly surface on March 1, 1994 when a Florida newspaper, the *Orlando Sentinel,* wrote that residents in a Florida subdivision had experienced disintegration of the OSB siding on their houses after exposure to water. The same newspaper published two related articles in August and September 1994 which also discussed rotting by the OSB siding. After each article, L–P denied that the siding was defective, and instead blamed troubles on improper maintenance.

On November 14, 1994, L–P filed its third quarter Form 10–Q which disclosed that L–P was being sued in a class action by Florida homeowners who installed the OSB siding which then deteriorated prematurely. The plaintiffs sought more than $150 million in damages, as well as an injunction barring L–P from selling and using OSB siding material in Florida. L–P also disclosed in the Form 10–Q, allegedly for the first time, that from 1985 through September 30, 1994, L–P paid approximately $35 million to settle OSB siding warranty claims on approximately 14,000 dwellings. Though L–P admitted to settling warranty claims, Plaintiffs allege that L–P gave no indication in 1994 that the defects in the OSB siding could have a material adverse impact on L–P's financial health.

On January 24, 1995, L–P reported record sales and earnings for 1994. L–P explained that a major factor contributing to the Company's success was the "outstanding performance" of OSB panel products. Two months later, in its 1994 Form 10–K, filed in March 1995, L–P assured investors that "the ultimate outcome of all the siding related matters will not have a material adverse effect on the business, financial position, or results of operation of [L–P]." Compl. ¶ 109 (quoting 1994 Form 10–K). However, the Form did disclose that L–P was the subject of a government investigation regarding the submission of unrepresentative OSB samples to the APA.

Finally, on May 15, 1995, L–P filed its Form 10–Q for the first quarter of 1995, in

which it disclosed the following facts: (1) the Attorney General for the State of Washington issued a formal civil investigation demand relating to alleged unfair deceptive acts or practices involving the manufacture and sale of OSB siding; (2) a class action had been filed against L–P in Washington seeking damages for a nationwide class of persons who purchased defective OSB siding; (3) L–P stated that resolution of siding matters could have a materially adverse impact on the Company; and (4) L–P would likely be indicted in Colorado for both environmental and APA-relating matters involving the OSB siding, and that the Company could be adversely affected by the resolution of these matters. These facts were published nationally by *The Wall Street Journal* on May 25, 1995. Thereafter, L–P stock dropped from $26.75 to $20.875 per share.

During the Class Period, each Individual Defendant was an officer of L–P and sold several thousand shares of L–P stock. First, Defendant Merlo was the Chairman of the Board, Director and President of L–P, and sold 116,308 shares for $3,828,071. Second, Defendant Eisses was the Director, Executive Vice President, and General Manager of the Northern Division of L–P, and sold 55,476 shares for $1,992,902. Third, Defendant Hebert was the Chief Financial Officer and Treasurer of L–P, and sold 16,614 shares for $638,015. Lastly, Defendant Paul was Director, Vice President of Operations, and General Manager of the Southern District of L–P, and sold 78,448 shares for $2,756,484. Plaintiffs allege that the Individual Defendants had a duty to disclose material adverse information regarding the siding because they were officers of L–P and knew or recklessly disregarded the fact that OSB siding was defective. Moreover, through their acts and omissions, the Individual Defendants allegedly engaged in a common course of conduct to artificially inflate the price of L–P stock, thereby benefitting themselves when they sold their shares.

Based upon these allegations, Plaintiffs assert one claim under section 10(b) of the Act and Rule 10b–5 against all Defendants, and a second claim under 20(a) of the Act against only the Individual Defendants. Defendants allegedly violated § 10(b) and Rule 10b–5 because they failed to disclose material adverse information regarding OSB siding and overstated the financial health of L–P. In support of this claim, Plaintiffs also cite violations of both Item 303 of Regulation S–K, 17 C.F.R. § 229.303(a)(1)–(3), promulgated by the SEC, and § 202.05 of the New York Stock Exchange ("NYSE") Manual. SK–303 imposes a duty to disclose "known trends or any known demands, commitments, events, or uncertainties" in a company's periodic report filed with the SEC. Similarly, § 202.05 of the NYSE Manual encourages companies listed on the NYSE to "release quickly to the public any news or information which might reasonably be expected to materially affect the market for its securities." Moreover, Plaintiffs claim that L–P's financial statements overstated the financial health of the Company in violation of 10b–5 because L–P did not comply with Generally Accepted Accounting Principles ("GAAP") SFAS No. 5 in considering future warranty claims.[5]

In response, all Defendants move to dismiss Plaintiffs' Complaint.

### STANDARD

A Rule 12(b)(6) motion to dismiss for failure to state a claim can be granted only if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Parks School of Business, Inc. v. Symington,* 51 F.3d 1480, 1484 (9th Cir.1995); *Mountain High Knitting, Inc. v. Reno,* 51 F.3d 216, 218

---

5. GAAP SFAS No. 5 provides in part:
 An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met:
 (a) Information available prior to issuance of the financial statement indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements. * * *
 (b) The amount of the loss can be reasonably estimated.
 Examples of loss contingencies include: * * *
 (b) Obligations related to product warranties and product defects.
 SFAS No. 5 ¶¶ 8, 4b.

(9th Cir.1995). All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff. *In Re Wells Fargo Sec. Litig.*, 12 F.3d 922, 925 (9th Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 295, 130 L.Ed.2d 209 (1994). In addition, allegations of a securities fraud action must meet the particularity requirements of Fed.R.Civ.Pro. 9(b). *Fecht v. Price Company*, 70 F.3d 1078, 1082 (9th Cir.1995).

## DISCUSSION

### I. Motions To Dismiss

#### A. Defendant L–P's Motion to Dismiss

##### 1. Arguments

L–P argues that Plaintiffs' case should be dismissed because Plaintiffs cannot show that L–P violated its duty to disclose material information under Rule 10b–5. Despite Plaintiffs' allegations that L–P violated § 202.5 of the NYSE Manual and SK–303 of SEC Regulations, L–P explains that Plaintiff must show that a duty to disclose independently exists under § 10(b). L–P had no duty to either disclose estimates of future litigation or admit to corporate misconduct. Furthermore, even if Plaintiffs can show that L–P had a duty to disclose, L–P contends that it has fulfilled and exceeded that duty with respect to revealing the number of siding claims as well as the likelihood of criminal indictment.

L–P also moves to dismiss Plaintiffs' case because they fail to allege fraud with sufficient particularity and cannot show that any statements made by L–P were false at the time they were made. Specifically, L–P argues that Plaintiffs do not state with sufficient particularity (1) when L–P knew that its siding was defective, (2) whether L–P knew about the alleged testing fraud with the APA, (3) whether L–P failed to account for future liabilities for warranty claims, and (4) whether historical statements regarding past financial events were false. In addition, L–P's optimistic statements about the future growth of OSB products were too vague to constitute actionable fraud.

L–P also maintains that statements by third-party analysts cannot be attributed to L–P because Plaintiffs did not allege that L–P provided misleading information to the analysts or adopted their reports. Lastly, L–P argues that even if L–P failed to disclose all facts, these omissions were not material as a matter of law because L–P used cautionary language with any optimistic statements.

In response, Plaintiffs argue that L–P touted OSB siding but failed to disclose material facts regarding its known defects. Moreover, L–P grossly underestimated the potential liability for future warranty claims because they continued to sell the OSB siding while ignoring its defects.

Plaintiffs also oppose L–P's contention that fraud is not pleaded with particularity by arguing that overwhelming evidence shows that L–P knew the OSB siding was defective when it made positive statements about the financial health of the Company and sales of OSB siding. Furthermore, L–P's positive statements were not too vague because L–P publicly bolstered the success of the OSB siding, without disclosing known adverse facts about defects. Likewise, statements regarding the financial success of the Company are also actionable because L–P failed to consider that significant portions of its earnings were from the sale of a defective product which created significant potential liability on warranty claims for the Company.

Plaintiffs also argue that the statements made by third party analysts are attributable to L–P because Plaintiffs allege that L–P intentionally provided misleading information to the analysts in order to encourage public purchase of L–P stock. Lastly, Plaintiffs contend that the materiality of the misrepresentations and omissions is a question of fact which cannot be resolved on a Rule 12(b)(6) motion.

##### 2. Analysis

###### a. Failure to State a Claim Under § 10(b) and Rule 10b–5

"To make out a claim under § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, plaintiff must show that there has been a misstatement or omission of material fact, made with scienter, which proximately caused his or her injury." *McCor-*

*mick v. Fund American Companies,* 26 F.3d 869, 875 (9th Cir.1994); *Monroe v. Hughes,* 31 F.3d 772, 776 (9th Cir.1994) (citing *Basic v. Levinson,* 485 U.S. 224, 231, 243, 108 S.Ct. 978, 983, 989, 99 L.Ed.2d 194 (1988)). "[I]n the case of an omission, '[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5.' " *McCormick* at 875 (quoting *Basic* at 239 n. 17, 108 S.Ct. at 987 n. 17).

▆▆▆ "[T]he securities laws do not impose general duties to speak." *Monroe v. Hughes,* 860 F.Supp. 733, 737 (D.Or.1991), *aff'd,* 31 F.3d 772 (9th Cir.1994). Furthermore, mere possession of material nonpublic information, absent some other act, does not create a duty to disclose. *Glazer v. Formica Corp.,* 964 F.2d 149, 157 (2nd. Cir.1992) "The First Circuit * * * rejected the proposition that 'a corporation has an affirmative duty to disclose all material information even if there is no insider trading, no statute or regulation requiring disclosure, and no inaccurate, incomplete, or misleading prior disclosures.' " (quoting *Backman v. Polaroid Corp.,* 910 F.2d 10, 12 (1st Cir.1990) (internal quotations omitted)); *see, e.g., Chiarella v. United States,* 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) ("a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information") (a financial printer who traded on confidential information regarding imminent takeover bids did not have a duty to disclose the nonpublic material information because he had no relationship of confidence and trust (*i.e.* fiduciary) with the sellers of the stock).

**6.** Even absent any misleading statements, an independent duty to disclose may be implicated by a fiduciary-type relationship between two parties to a securities transaction. *See, Chiarella* 445 U.S. at 227–30, 100 S.Ct. at 1114–15 (affirmative duty of disclosure arises where (1) a fiduciary relationship exists between the parties to the transaction and (2) it would be unfair if the party with the confidential information failed to disclose it); *McCormick,* 26 F.3d at 876 ("corporate issuer in possession of material nonpublic information, must, like other insiders in the same situation, disclose that information to its shareholders or refrain from trading with them.")

Whether a defendant had an affirmative duty to disclose under Rule 10b–5 is evaluated with reference to five non-exclusive factors:

▆▆▆ However, when a corporation makes affirmative statements which are rendered misleading by omissions of material facts, that corporation has a duty to disclose whatever additional information is necessary to rectify the misleading statements. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 504 (9th Cir.1992); *Rubinstein v. Collins,* 20 F.3d 160, 170 (5th Cir.1994) ("a duty to speak the full truth arises when a defendant undertakes a duty to say anything." (internal quotations omitted)); *In Re Clearly Canadian Sec. Litig.,* 875 F.Supp. 1410, 1418 (N.D.Cal.1995) ("This rule applies to statements of future projections as well as statements of past performance.") [6]

In the present action, L–P made certain statements about the financial health of the Company; thus, L–P had a duty to disclose the information necessary to ensure that its statements were not materially misleading. However, in order to determine whether L–P had a duty to disclose omitted information, the Court must first find that L–P omitted material facts which caused its statements to become misleading, and thus trigger a duty to disclose.

▆▆▆ I find very instructive the Ninth Circuit's recent discussion on the issues of "materiality" and whether a public statement is "misleading:"

Whether an omission is "material" is a determination that "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC*

(1) the relationship of the defendant to the plaintiff;
(2) the defendant's access to information as compared to the plaintiff's access;
(3) the benefit that the defendant derives from the relationship with the plaintiff;
(4) the defendant's awareness of plaintiff's reliance; and
(5) the defendant's activity in initiating the securities transaction in question.

*Roberts v. Peat, Marwick, Mitchell & Co.,* 857 F.2d 646, 653–654 (9th Cir.1988), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989); *Jett v. Sunderman,* 840 F.2d 1487, 1492–93 (9th Cir.1988).

*Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 450[, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757]; *accord United States v. Gaudin,* —— U.S. ——, ——, 115 S.Ct. 2310, 2314, 132 L.Ed.2d 444] (1995) (materiality is an "application-of-legal-standard-to-fact sort of question * * * [that] has typically been resolved by juries"); *Kaplan v. Rose,* 49 F.3d 1363, 1375 (9th Cir.1994) ("materiality" is a "fact-specific issue[ ] which should ordinarily be left to the trier of fact"), *cert. denied,* —— U.S. ——, 116 S.Ct. 58[, 133 L.Ed.2d 21] (1995). Similarly, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact. *Durning v. First Boston Corp.,* 815 F.2d 1265, 1268 (9th Cir.) (quoting *TSC Indus.,* 426 U.S. at 450, [96 S.Ct. at 2133], and stating that "[l]ike materiality, adequacy of disclosure is normally a jury question"), *cert. denied,* 484 U.S. 944[, 108 S.Ct. 330, 98 L.Ed.2d 358] (1987). Therefore, only if the adequacy of the disclosure or the materiality of the statement is "so obvious that reasonable minds [could] not differ" are these issues "appropriately resolved as a matter of law." *Durning,* 815 F.2d at 1268; *accord TSC Indus.,* 426 U.S. at 450[, 96 S.Ct. at 2133].

*Fecht v. Price Company,* 70 F.3d 1078, 1080–81 (9th Cir.1995) (court of appeals reversed district court's dismissal on a Rule 12(b)(6) motion because court could not hold as a matter of law that omissions regarding the negative financial health of company did not cause public statements to become misleading). "[A]n omitted fact is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " *McCormick,* 26 F.3d at 876 (quoting *Basic,* 485 U.S. at 231–32, 108 S.Ct. at 983 (internal quotations omitted)). Finally, in determining whether omission of a material fact makes a statement fraudulent under Rule 10b–5, the Court examines the statement in light of the circumstances under which it was made. *Hanon,* 976 F.2d 497, 501; *In re Convergent Technologies Sec. Litig.,* 948 F.2d 507, 512 (9th Cir.1991). Consequently, whether an omission is material and

whether a statement is misleading are two interrelated, but separate, fact-specific inquiries, *see, e.g., Basic* at 238, 240, 108 S.Ct. at 986, 988 ("a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant"), which generally cannot be resolved on a Rule 12(b)(6) motion to dismiss where all factual allegations must be accepted as true.

■ Applying the principles discussed above, I find that there are more than sufficient allegations in the Complaint which would allow a reasonable jury to conclude that L–P omitted material facts from statements concerning the financial health of the Company and the "success" of OSB siding products which caused those statements to become materially misleading. For instance, the following is a chronological sample of public statements by L–P:

(1) November 3, 1993—Company announced plans to construct a new OSB manufacturing plant in Texas and reported,

 (a) "[L–P] was the first major U.S. manufacturer of OSB products and is recognized as the clear leader in the field both in terms of production levels and technological innovation"; and,

 (b) OSB "is a superior multi-purpose building panel approved by the [APA]";

(2) January 26, 1994—

 (a) Company celebrated record earnings for 1993, attributing its success to "[L–P's] emphasis on innovative, affordable building materials made from plentiful, non-controversial timber sources * * *"; and,

 (b) L–P's CEO further stated, "We're going into 1994 with good pricing and strong building products demanded in an economy that's still in the early stages of recovery";

(3) February 4, 1994—in its Form 10–K, L–P reported,

 (a) "Particularly strong performers in 1993 were panel products: oriented

strand board (OSB), plywood, and industrial panel products"; and,

.(b) OSB gave L–P a "competitive advantage";

(4) March 1, 1994—in its Annual Report to Shareholders,

 (a) L–P predicted a bright future for OSB products by stating, "We continue to see a growing demand for our [OSB] products * * *. That's why we're continuing to expand production capacity. During the year we completed our sixteenth and seventeenth [OSB] plants and we have seven more either under construction or in the planning and permit stages. * * * So conditions look good for a continuation of L–P's strong performance"; and

 (b) L–P's CEO explained that L–P was "not even close" to saturating the market with OSB products especially considering "the expected improvement in housing starts";

(5) April 28, 1994—L–P's Industrial Relations Manager was quoted in the *Journal of Business–Spokane* as saying that "[OSB] often makes a superior product to solid wood alternatives."

Compl. ¶¶ 77–79, 81–84, 90. These statements are only a partial sampling of L–P's representations about the past and future success of OSB siding in the market. Though many of the statements may be literally true, a reasonable jury could conclude that L–P's omission of the defective nature of OSB siding caused those representations to create a false impression that OSB siding was a successful product, superior to wood paneling, which would catapult L–P's success in the siding market. Consequently, I find that L–P has not sustained its burden of establishing that no reasonable jury could find that the market was misled by its statements and omissions: "The total mix of information * * * sufficiently gives rise to different interpretations as to whether the representations and/or omissions made by [L–P] were materially misleading to the market, [thus] the impression that this mix of information conveyed cannot be resolved as a matter of law." *Kaplan v. Rose*, 49 F.3d 1363, 1377–78 (9th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995) (internal quotations omitted).[7]

The trier of fact must determine whether L–P's omissions caused its statements to become materially misleading, thus imposing on L–P a duty to disclose the omitted material facts. Therefore, at this juncture, I cannot

---

**7.** In an attempt to show that alleged misrepresentations and omissions were not misleading as a matter of law, L–P invokes the "bespeaks caution" doctrine which " 'provides a mechanism by which a court can rule as a matter of law * * * that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud.' " *Fecht*, 70 F.3d 1078, 1081 (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995)). L–P's cautionary statements were made in its 10–Q Report for the Third Quarter of 1994, filed with the SEC on November 14, 1994: "[I]t is probable that additional OSB siding claims will be made against [L–P] * * * [and] [s]ome of these claims will likely be made in the form of warranty claims, while others will likely be made as litigation claims. * * * [S]ignificant uncertainty exists in the reliability and precision of such estimates [of future claims]. There can be no assurance that management's estimates will not significantly increase or decrease in the future * * *." Def. L–P Ex. 2 at 12. However, in its 1994 Form 10–K filed in March 1995, L–P concluded, " 'Management believes that the ulti-mate outcome of all the siding related matters will not have a material adverse effect on the business, financial position, or results of operations of [L–P].' " Compl. ¶ 109 (quoting 1994 10–K).

As the Ninth Circuit emphasized, the "bespeaks caution" doctrine does not change the standard by which the court determines whether the factual issue can be resolved as a matter of law: *i.e.*, whether "reasonable minds could not disagree as to whether the *mix* of information in the [statement] is misleading." *Fecht* at 1082. Therefore, "[a] motion to dismiss for failure to state a claim will succeed only when the documents containing defendants' challenged statements include '*enough* cautionary language or risk disclosure,' *Worlds of Wonder*, 35 F.3d at 1413 (citations omitted), that 'reasonable minds' could not disagree that the challenged statements were not misleading." *Fecht* at 1082 (quoting *Worlds of Wonder* at 1413). As the court concluded in *Fecht*, L–P's "statements do not meet this requirement, and invocation of the 'bespeaks caution' doctrine cannot save [L–P's] 12(b)(6) motion" because there are issues of fact regarding the materiality of the omissions and the misleading nature of the statements. *Id.*

resolve whether L–P had an affirmative duty to disclose omitted facts about the OSB siding.

However, because Plaintiffs' lawsuit is brought under Rule 10b–5, L–P's potential duty to disclose must arise from 10b–5, and not from the NYSE Manual or SK–303. Therefore, Plaintiffs' citations to the NYSE Manual and SK–303 are irrelevant with respect to establishing L–P's duty to disclose under § 10(b) and Rule 10b–5. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir.1993) ("We decline to hold that a violation of exchange rules governing disclosure may be imported as a surrogate for straight materiality analysis under § 10(b) and Rule 10b–5."); *see also In re Caere Corp. Sec. Litig.*, 837 F.Supp. 1054, 1061–62 n. 4 (N.D.Cal.1993) (" 'the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5. Such a duty to disclose must be separately shown.' " (quoting *Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 608 (N.D.Cal.1991))[8]. Though the NYSE Manual and SK–303 do not establish L–P's duty to disclose under Rule 10b–5, they are relevant to whether L–P violated its alleged duty to disclose with the requisite scienter.[9] *See Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814, 824 (1980) (violation of NYSE Rule that required broker to "know

his customer" evidenced a scheme to defraud, or, at the minimum, a reckless disregard for the client's interests). The important distinction is that Plaintiffs may not use the NYSE Manual or SK–303 to establish the *existence* of the duty to disclose, but those regulations may show that the duty was *violated with requisite intent.* Therefore, Plaintiffs may use violations of the NYSE Manual and SK–303 only for the purposes of proving that L–P *recklessly or intentionally violated its duty to disclose* under Rule 10b–5.

Plaintiffs also cite GAAP SFAS No. 5 in support of their allegation that L–P misrepresented its income by failing to properly account for the inevitable future liabilities resulting from warranty claims on the defective OSB siding. However, a violation of GAAP, without more, does not establish fraud. *In re Software Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir.1994); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994).[10] Nonetheless, a violation of GAAP is evidence that the company overstated its income which may be used to show a violation of § 10(b) and 10b–5. *See, e.g., In re Jiffy Lube Sec. Litig.*, 772 F.Supp. 258, 265 (D.Md.1991) (Plaintiffs were not required to state a specific dollar amount of overstated income because it was sufficient that plain-

---

8. *See also In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 n. 6 (9th Cir.1993) (declining to decide relevance of SK–303 violation to 10b–5 claim); *Kriendler v. Chemical Waste Management, Inc.*, 877 F.Supp. 1140, 1157 (N.D.Ill.1995) (adopting Ninth Circuit's analysis which concludes that " 'a violation of exchange rules governing disclosure may [not] be imported as a surrogate for * * * analysis under § 10(b) and Rule 10b–5." (quoting *In re VeriFone Sec. Litig.*, 11 F.3d at 870)).

9. "Scienter" is a necessary element in an action for damages under § 10(b) and Rule 10b–5, and is defined as " 'a mental state embracing intent to deceive, manipulate, or defraud.' " *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568 (9th Cir.1990) (en banc) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 1382, n. 12, 47 L.Ed.2d 668 (1976)), *cert. denied*, 499 U.S. 976, 111 S.Ct. 1621, 113 L.Ed.2d 719 (1991)). The *Hollinger* court also held that "reckless omission of material facts" may satisfy scienter under § 10(b) and Rule 10b–5.

10. The Fourth Circuit in *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir.1994) explains the interrelation between regulations under § 10(b) and GAAP:

> The Financial Accounting Standards of GAAP and the antifraud rules promulgated under § 10(b) of the 1934 Act serve similar purposes, and courts have often treated violations of the former as indicative that the latter were also violated. The prohibitions contained in the GAAP and in Rule 10b–5, however, are not perfectly coextensive. In some circumstances, courts have found defendants liable for securities fraud under Rule 10b–5 despite having complied with GAAP, *see, e.g., Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 378 F.Supp. 112, 121–22 (S.D.N.Y.1974), *rev'd in part on other grounds*, 540 F.2d 27 (2nd Cir. 1976), while in other circumstances, courts have discharged defendants from Rule 10b–5 liability notwithstanding deliberate violations of GAAP, *see Vosgerichian v. Commodore Int'l*, 832 F.Supp. 909, 915 n. 8 (E.D.Pa.1993) (citing cases); *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y.1992).

tiffs cite the specific provisions of GAAP that were violated). Therefore, Plaintiffs may rely on GAAP in support of their claim that L–P misrepresented its income and the financial health of the Company by reporting record earnings without adequately accounting for future liabilities from the defective siding, although violations of GAAP do not stand as an independent claim.[11]

### b. Pleading Fraud With Particularity Under Rule 9(b)

■■■■■ With regard to Plaintiffs' allegations of securities fraud, L–P correctly argues that the allegations must satisfy the particularity requirements of Fed.R.Civ.Pro. 9(b): " 'In a securities fraud action, a pleading is sufficient under Rule 9(b) if it identifies the circumstances of the alleged fraud so that the defendant can prepare an adequate answer.' " *Fecht*, 70 F.3d at 1082 (quoting *Kaplan*, 49 F.3d at 1370). "This notice requirement is satisfied by allegations of the time, place and nature of the alleged fraudulent activities." *Fecht* at 1082 (internal quotations omitted). More specifically, a plaintiff must identify the fraudulent statement and explain why the statement was untrue or misleading when made. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994) (en banc).

■■■■■ As set forth above, Plaintiffs allege that L–P made material omissions which caused its statements to become misleading: Plaintiffs claim that L–P's public statements about its record earnings and the success of OSB siding created the impression that OSB siding greatly enhanced L–P's financial health. This was misleading because L–P omitted the fact that the OSB siding was defective and that the record earnings did not reflect inevitable warranty claims resulting from the ever-increasing sales of defective OSB siding. In fact, by increasing production and sales of an alleged known defective product, L–P was secretly "shooting itself in the foot" for short term gain. As chronologically set forth above, the time and place of these statements, as well as the omissions which caused them to be misleading to investors, were sufficiently identified in the Complaint. Therefore, I find that Plaintiffs satisfied the *GlenFed* standard of particularity.

■■■■■ Finally, L–P seeks to dismiss Plaintiffs' allegations that statements by analysts were attributable to L–P. "[A] company may be liable for analysts' forecasts which it fostered and reviewed but failed to correct, if it expressly or impliedly represented that the information was accurate or coincided with the company's views." *Stack v. Lobo*, 903 F.Supp. 1361, 1371 (N.D.Cal.1995); *In re Cypress Semiconductor Sec. Litig.*, 891 F.Supp. 1369, 1377 (N.D.Cal.1995); *In re Syntex Corp. Sec. Litig.*, 855 F.Supp. 1086, 1097 (N.D.Cal.1994). "For liability to attach, the plaintiff must demonstrate: (1) that a corporate insider adopted the analysts' forecasts, [citation omitted], and (2) that the insider knew the analysts' forecasts were unreasonable when made yet failed to disclose their unreasonableness to investors." *Stack* at 1371–72.

■■■■■ To plead a claim of corporate liability for analysts' statements with sufficient particularity under Rule 9(b), a plaintiff must

---

**11.** L–P correctly argues that mere mismanagement from the failure to follow GAAP is not, in and of itself, securities fraud. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 474–77, 97 S.Ct. 1292, 1301–02, 51 L.Ed.2d 480 (1977) (holding corporate mismanagement, absent deception, not actionable under Section 10(b)). However, " 'a complaint does allege an actionable misrepresentation if it alleges that a defendant was aware that mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement.' " *In re Wells Fargo*, 12 F.3d 922, 927 (quoting *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir.1992)).

In the present action, L–P allegedly knew that the OSB siding was defective and warranted for 25 years. Nonetheless, without disclosing that OSB siding was defective, L–P reported record earnings in part from sales of the OSB siding, and also that the Company intended to construct more OSB plants to supply the demand for OSB siding. Consequently, I find that it is reasonable to infer that L–P, knowing that OSB siding was defective and warranted for 25 years, misrepresented the financial health of the Company. Part of this misrepresentation includes the failure to publicly acknowledge the inevitable future liability on warranty claims from a known defective product for which sales were increasing every year.

"(1) identify specific analysts' forecasts and name the insider who adopted them; (2) point to specific interactions between the insider and the analyst which gave rise to entanglement, and; (3) state when these interactions occurred." *Stack* at 1371; *Syntex* at 1097. A one-way flow of information from the corporation to the analysts is insufficient to show that the corporation "entangled" itself with the analysts' statements prior to or after their publication. *See Syntex* at 1097.

 In this case, Plaintiffs allege that L–P, through its senior officers, "communicate[d] regularly with securities analysts, including those at the firms whose reports have been identified above." Compl. ¶ 39. In addition, L–P compiled an "investors' relations package" which it distributed to members of the financial press. *Id.* ¶ 40. Plaintiffs further claim that in reliance on false information received from L–P through its officers and its "investors' relations package," analysts published misleading statements about the Company. *Id.* ¶¶ 37–42.

I find these allegations are deficient for at least three reasons: (1) they fail to identify specific forecasts and name the insider who adopted them; (2) they fail to provide specific dates when the communications between L–P and the analysts occurred, and (3) they suggest nothing more than a one-way flow of information from L–P to the analysts. Most importantly, there are no factual allegations that L–P "entangled" itself with the analysts' reports prior to or after their publication, for example, by approving the analysts' statements or by attesting to the accuracy of the statements. *See, e.g. Syntex* at 1097 (one-way flow of information was insufficient to establish corporate liability for analysts' statements).[12] Therefore, allegations concerning statements made by analysts, to the extent to which they may state a claim, are DISMISSED WITH PREJUDICE.[13]

Accordingly, Defendant L–P's Motion to Dismiss (# 52) is GRANTED IN PART and DENIED IN PART.

## B. Defendant Eisses's Motion to Strike/Dismiss

### 1. Arguments

Defendant Eisses moves to strike three paragraphs and dismiss Count 1 of the Complaint. First, Eisses argues that paragraph 123 of the Complaint, which details the specific amounts of stock that the individual Defendants sold during the class period, should be stricken because Plaintiffs do not allege a claim for insider trading. Second, Defendant moves to dismiss paragraph 32, which states that Defendants engaged in a "common enterprise or common course of conduct" to inflate the L–P stock price, because Plaintiffs are not pleading a conspiracy claim. Third, Defendant moves to strike paragraph 29, which alleges that Defendants had a duty to "disseminate accurate and truthful information respecting the company's operations, business, products, markets, earnings, present and future business prospects * * * and to disclose any adverse trends that would materially affect the present and true financial operating results * * *," because Defendants are under no duty to reveal adverse data which softens the demand for its product. Lastly, Defendant moves to dismiss Count 1 of the Complaint which claims that Defendants knowingly or recklessly failed to investigate or disseminate information. Though Defendant acknowledges that under Ninth Circuit precedent recklessness satisfies the element of scienter, he maintains that the United States Supreme Court has not ruled on that issue.

### 2. Analysis

 As a preliminary matter, I note that Plaintiffs correctly stated at oral argument that "motions to strike are 'regarded with disfavor because [they] are often used

---

12. *Alfus v. Pyramid Technology Corp.,* 764 F.Supp. 598 (N.D.Cal.1991) is distinguishable from the present action because in *Alfus* the corporation provided information to the analysts which the corporation approved for publication and also reviewed before publication in the analysts' reports. *Id.* at 602–603. In contrast, there is no allegation that L–P placed its "imprimatur" on the analysts' reports. *See Id.* at 603.

13. However, the allegations will not be stricken and shall remain in the Complaint to provide clarity with respect to the events surrounding L–P's alleged omissions.

as delaying tactics, and because of the limited importance of pleadings in federal practice.'" *S.E.C. v. Sands,* 902 F.Supp. 1149, 1165–66 (C.D.Cal.1995) (quoting Schwarzer, Tashima, Wagstaffe, *Federal Civil Procedure Before Trial,* RUTTER GROUP PRACTICE GUIDE § 9:375 (1995)). Therefore, a motion to strike should only be granted upon showing that "the challenged allegations are so unrelated to the non-movant's claims as to be unworthy of consideration and show prejudice by the presence of such allegations in the pleadings." *In re Chambers Development Sec. Litig.,* 848 F.Supp. 602, 617 (W.D.Pa.1994); *see also Sands,* 902 F.Supp. at 1166.

▇▇▇ Turning to Eisses's arguments, I address them in order. First, Eisses's Motion to Strike paragraph 123 is DENIED because "[i]nsider trading in suspicious amounts or at suspicious times is probative of bad faith and scienter" with regard to statements made by the corporation to investors.[14] *See, e.g., In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990). Second, Eisses's Motion to Strike paragraph 32 is GRANTED IN PART: Plaintiffs must strike the language "a common enterprise or common course of" from paragraph 32 because Plaintiffs do not state a claim for conspiracy. Third, Eisses's Motion to Strike paragraph 29 is GRANTED because Plaintiffs allege a legal conclusion regarding the existence and scope of Defendants' duty to disclose which, as discussed above, is an issue for the Court to resolve, with the assistance of the trier of fact. Lastly, Eisses's Motion to Dismiss Count 1 is DENIED because, as Eisses concedes, Ninth Circuit precedent allows recklessness to satisfy the element of scienter. *In re Software Toolworks Inc.,* 50 F.3d 615, 626 (9th Cir. 1994) (citing *Hollinger,* 914 F.2d 1564, 1568–69), *cert. denied,* —— U.S. ——, 116 S.Ct. 274, 133 L.Ed.2d 195 (1995).

Accordingly, Defendant Eisses's Motion to Strike and Dismiss (# 41) is GRANTED IN PART and DENIED IN PART.

### C. Defendant Merlo's Motion to Strike/Dismiss

#### 1. Arguments

Defendant Merlo moves to dismiss the Complaint under Rule 9(b) because Plaintiffs fail to allege fraud with particularity. Though Plaintiffs allege generally that Defendants made representations which were inconsistent with contemporaneous internal documents, conversations, and meetings, Defendant argues that Plaintiffs fail to identify with sufficient particularity these documents, conversations, or meetings. Second, Defendant moves to strike several paragraphs in the Complaint which allege that Defendants' financial reports were materially misleading because the market reports accurately stated the current performance of the company. Third, Defendant requests the Court to strike paragraphs which allege that Defendants are liable for incorrect statements made in analyst and media reports because Defendants did not adopt those reports. Lastly, Defendant moves to dismiss paragraph 130 which alleges that Defendants were obligated to disclose "known trends * * * or uncertainties" pursuant to SEC regulation SK–303. Defendant explains that this argument has already been rejected by the Ninth Circuit which held that 17 C.F.R. § 229.303(a) expressly states that "forward-looking information need not be disclosed," and that violation of an exchange rule will not support a private cause of action. *In re VeriFone Sec. Litig.,* 11 F.3d 865, 870 (9th Cir.1993).

#### 2. Analysis

Defendant Merlo presents the same arguments that I addressed earlier with respect to L–P. Therefore, without restating the entire analysis, I will briefly resolve each contention: I find that (1) Plaintiffs alleged fraud with sufficient particularity, (2) there are disputed issues of fact with regard to the materiality and falsity of the representations made by Defendants, (3) allegations regarding analyst and media reports, to the extent that they state a claim, are DISMISSED because Plaintiffs cannot impute those state-

---

14. However, at oral argument, Plaintiffs judicially admitted that they will not pursue a claim for insider trading against Defendant Hebert. Plaintiffs are hereinafter bound by that admission.

ments to Defendants, and (4) Plaintiffs allegations of violations of SK–303 and the NYSE Manual are relevant on the issue of Defendants' scienter. For a more detailed discussion of these issues, see my earlier analysis under L–P's Motion to Dismiss. Defendant Merlo's Motion to Dismiss (# 43) is GRANTED IN PART and DENIED IN PART.

### D. Defendant Paul's Motion to Strike/Dismiss

#### 1. Arguments

Defendant Paul moves to dismiss the Complaint because Plaintiffs failed to file their lawsuit within the three year period of ultimate repose. Because Plaintiffs brought this action on September 1, 1995, no 10b–5 claim can be predicated on facts prior to September 1, 1992 which include the following:

(1) the 1990 settlement of the Minnesota Attorney General's action against L–P,

(2) the 1991 and March 1992 letters from Miller Paint regarding moisture and disintegration problems, and

(3) allegations regarding numerous complaints about the siding in the early 1990s.

Paul contends that these allegations fall outside of the three-year period of ultimate repose, thus Plaintiffs may not rely upon them to assert a fraud claim.

Second, Defendant contends that Plaintiffs' fraud claim is also barred by the one-year statute of limitations because Plaintiffs reasonably knew more than one year prior to filing this action that L–P allegedly failed to disclose material information about the siding. Plaintiffs were on notice on February 4, 1994 when they were informed in L–P's 1993 Form 10–K of the grand jury's investigation into the "alleged tampering with emissions monitoring equipment and the alteration of plant records" at L–P's plant in Montrose, Colorado. In addition, Plaintiffs also should have known of the fraud on March 1, 1994

when the *Orlando Sentinel* published an article about the defective siding, and March 31, 1994 when the stock price dropped more than 20%.[15] Because Plaintiffs should have known of the fraud more than one year prior to filing suit, their claims are barred.

In the alternative, Defendant moves the Court to either dismiss the Complaint or strike individual allegations or paragraphs from the Complaint for the following reasons:

(1) L–P fulfilled its disclosure duties under SEC regulations and Ninth Circuit precedent, therefore, Plaintiffs have not alleged a legally cognizable fraud claim;

(2) Plaintiffs fail to allege fraud with sufficient particularity because they do not identify specific contemporaneous materials or events which show that Defendants misstated the truth;

(3) statements regarding the "aftermath of the fraud" should be stricken from the Complaint because they occurred after the class period, and thus are irrelevant.

(4) Plaintiffs fail to allege accounting fraud with particularity;

(5) Defendants statements about the historical progress of L–P and the sales of siding are not actionable because they do not contain predictions about the future;

(6) statements made by third party analysts cannot support a fraud claim against Defendants; and,

(7) Plaintiffs fail to state facts which demonstrate that the alleged misrepresentations or omissions by Defendants were material.

(8) paragraph 123 which alleges facts regarding individual defendants' trading activity should be stricken because Plaintiffs are not asserting an insider trading claim;

---

**15.** Plaintiffs also contend that the drop in the stock price is, itself, sufficient to put a reasonable investor on notice of the fraud. *See Tregenza v. Great American Communications Co.,* 12 F.3d 717, 720 (7th Cir.1993). However, the case cited by Paul involved almost a 90% decrease where the investors were promised that it would not lose more than 10% of its value, as opposed to only a 20% decrease in the present action. A 20% decrease in a company's stock, without more, is not sufficient to apprise a reasonable investor of fraud.

(9) paragraph 32 which alleges a "common enterprise or common course of conduct" must be dismissed because there is no private cause of action under 10b–5 for conspiracy; and,

(10) paragraph 29 which states that L–P was under a duty to release earnings projections should be stricken because it is incorrect.

In opposition, Plaintiffs disagree with Defendant Paul that evidence of events prior to the three-year period of ultimate repose may not be used to establish scienter for the securities fraud claim. Plaintiffs argue that such evidence is clearly admissible under Fed.R.Evid. 404(b) to show "intent, preparation, plan, or knowledge." Furthermore, Plaintiffs contend that they had neither actual nor inquiry notice in 1994 because no public statement regarding the APA testing fraud was released until 1995.[16] Likewise, the disclosures in the 1993 Form 10–K filed in February 1994, did not discuss the fraudulent OSB samples sent to the APA.

## 2. Analysis

■■■■ "Litigation instituted pursuant to § 10(b) and Rule 10b–5 * * * must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, et al. v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991). "The statute of limitations for claims brought under Rule 10b–5 is triggered 'when the plaintiff has actual knowledge of the fraud or knowledge of facts sufficient to put a reasonable person on notice.'" *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1099 (N.D.Cal.1994) (quoting *Davis v. Birr, Wilson & Co., Inc.,* 839 F.2d 1369, 1370 (9th Cir.1988)); *see also Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1412 (9th Cir.1987) ("the statute of limitations is not triggered until the defrauded individual[s] ha[ve] actual or inquiry notice that a fraudulent misrepresentation has been made * * * [which is when] they discovered or should have discovered the facts constituting their claim."); *Whirlpool Financial Corp. v.*

*GN Holdings, Inc.,* 67 F.3d 605, 609 (7th Cir.1995) ("Inquiry notice starts the running of the statute of limitations when the victim of the alleged fraud became aware of facts that would have led a reasonable person to investigate whether he might have a claim." (internal quotations omitted)).

■■■■ "The determination of whether a plaintiff knew or should have known of a cause of action presents a question for the trier of fact," *Reeves v. Teuscher,* 881 F.2d 1495, 1501 (9th Cir.1989) (citing *Volk,* 816 F.2d at 1417). "It may be decided as a matter of law only when uncontroverted evidence irrefutably demonstrates plaintiff discovered or should have discovered the fraudulent conduct." *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 877 (9th Cir. 1984), *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984). Therefore, Plaintiffs' claims accrued from the moment that they had actual or inquiry notice of Defendants' fraud.

■■■■ "The information that triggers inquiry notice of the probability of an alleged securities fraud is any financial, legal, or other data available to the plaintiffs providing them with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the sale of securities." *In re Integrated Resources Real Estate Sec. Litig.,* 815 F.Supp. 620, 639 (S.D.N.Y.1993) (internal quotations omitted).

■■■■ As stated above, there are two relevant time periods which Defendant Paul attempts to use to bar Plaintiffs' claims: a one-year limitations period and a three-year period of ultimate repose. With regard to the three-year period of ultimate repose, Defendant Paul misconstrues the function of this period which is merely to bar stale claims. "The statute of limitations is a defense * * *, not a rule of evidence * * *. It has no bearing on the admissibility of evidence, [rather] [a] suggestion that the evidence is too old goes to its relevance and to its weight." *Sir Speedy, Inc. v. L & P*

---

**16.** Plaintiffs do not respond to Defendant Paul's remaining arguments, other than to note that the arguments merely reiterate those made by the other Defendants to which Plaintiff have already replied.

*Graphics, Inc.,* 957 F.2d 1033, 1038 (2nd Cir.1992) (internal quotations omitted). Therefore, Plaintiffs are not barred from presenting relevant, admissible evidence from before the three-year period to prove an element (*i.e.* knowledge for scienter) of their timely claim.

■ With regard to the one-year limitations period, I disagree with Paul that Plaintiffs should have known of the fraud, as a matter of law, more than one year prior to filing their lawsuit. The issue is at what time should Plaintiffs have known that Defendants were perpetrating a fraud on the market?

The statement in the 1993 Form 10–K is too vague to put a reasonable investor on notice of a fraud on the market:

> The registrant has been informed that it and one or more employees at its Olathe, Colorado, oriented strand board plant are the targets of a federal grand jury investigation concerning alleged tampering with emissions monitoring equipment and alternation of plant records.

Def. L–P Ex. 1. This is hardly enough information for a reasonable investor to conclude that the corporation was perpetrating a fraud with respect to OSB siding.

Similarly, the article in the *Orlando Sentinel* was also insufficient as a matter of law to put a reasonable investor on notice of the fraud because L–P maintained that problems regarding the siding were the result of improper homeowner maintenance. Perhaps a reasonable investor should have known from that article about potential defects in the siding for Florida's climate, but the article neither provides notice that L–P defrauded the APA nor states that L–P sold the siding with knowledge that it was defective. Nonetheless, as evidenced at oral argument, there are many disputed facts regarding when the market should have discovered the fraud. Consequently, I decline to resolve the issue of inquiry notice at this stage of the litigation; but, Defendants are free to raise this defense when they move for summary judgment, or judgment as a matter of law under Fed.R.Civ.Pro. 50, after more facts are fleshed out.

With regard to Paul's remaining contentions, I will briefly respond to each as they are set forth above: (1) material issues of fact prevent this Court from resolving whether L–P had a duty to disclose and whether it fulfilled that duty, but allegations regarding violations of the NYSE Manual and SK–303 may be probative of the presence or absence of Defendants' intent to defraud in making public representations; (2) Plaintiffs alleged fraud with sufficient particularity; (3) statements regarding the "aftermath of the fraud" (¶¶ 13–16, 116–122) relate to the extent of damages; (4) statements relating to a violation of GAAP are relevant on the claim for securities fraud; (5) material issues of fact prevent this Court from resolving whether Defendants' statements about historical progress and sales of siding created a misleading impression; (6) statements made by analysts (¶¶ 76, 80, 91, 101) cannot be imputed to Defendants, and thus, to the extent that they state a claim, are DISMISSED from the Complaint; (7) the materiality of the alleged omissions is a material issue of fact; (8) paragraph 123 is probative on bad faith and scienter of the corporation; (9) the language "a common enterprise or common course of" is STRICKEN from the Complaint because Plaintiffs do not allege an actionable conspiracy; and, (10) paragraph 29 is STRICKEN because Plaintiffs merely allege a legal conclusion which confuses the issues.

Accordingly, Defendant Paul's Motion to Strike and Dismiss (# 58) is GRANTED IN PART and DENIED IN PART.

## II. Plaintiffs' Motion for Class Certification

### A. Arguments

There are two primary issues in Plaintiffs' Motion for Class Certification: (1) the appropriate end date for the Class Period, and (2) whether inter-purchaser conflicts within the Class prevent certification.

#### 1. Class Period End Date

■ On the first issue, Defendants urge the Court to end the Class Period on May 16,

1995,[17] rather than May 24, 1995, because the *Wall Street Journal* merely reprinted the same information from the Form 10–Q which was publicly filed on May 15, 1995. In support of this argument, L–P provides affidavits by investors who rely on SEC filings like the Form 10–Q.

Furthermore, L–P contends that in order to assert a claim for fraud on the market, Plaintiffs must concede that any public filing is deemed to have an immediate impact on an "efficient market," otherwise the omissions or misstatements would not affect the market stock price. *See* Stillman Decla. at 6 ("in an efficient market, all purchasers of the stock are affected if there are material misstatements (via the effect of the misstatements on the price of stock), even if individual investors are completely unaware of the statements at issue. On the other hand, if the market for a company's stock is not efficient, then there is no basis in economics to presume that material misstatements are reflected in that company's stock price and hence no basis to presume that investors are affected by the alleged misstatements.") Therefore, the Class Period must end no later than May 16, 1995.

Plaintiffs respond by arguing that the appropriate end date for the Class period is not when the information was given to the SEC, but rather the day before the information was assimilated by the market: *i.e.,* when the *Wall Street Journal* published its article on May 25, 1995. As evidenced by the 15% decrease in L–P's stock price on May 25, 1995, the market was not informed until after publication of the *Wall Street Journal* article. In contrast, the price of the stock did not react to the SEC filing on May 15, 1995.

In further support of their argument, Plaintiffs provided the affidavit of a former SEC Commissioner, Richard Roberts, who explained that the market reacts to information from investment advisory agencies like Dean Witter and the *Wall Street Journal,* rather than public filings. *See* Roberts Decla. Plaintiffs also cite a district court case from Connecticut which rejected an argu-

ment like L–P's and ended the Class Period when the information was released by a national magazine, rather than 16 days earlier when the company issued a press release. *Garfinkel v. Memory Metals, Inc.,* 695 F.Supp. 1397, 1405–06 (D.Conn.1988). Lastly, Plaintiffs provide two District of Oregon securities fraud cases which ended the Class period on the day that the market effectively received the information which was illustrated by a significant decrease in the stock price. *See Gordon v. Floating Point Systems, Inc.,* No. 86–952–JU, slip op. (D.Or. 1989); *In re Melridge, Inc. Sec. Litig.,* 1990 WL 117822 (D.Or.1990). Consequently, the appropriate end of the Class Period is May 24, 1995, the day before the market was fully informed of the information as illustrated by the stock price decrease.

### 2. Inter-purchaser Conflicts Between Class Members

On the second issue, L–P asserts that the Class Members are in potential conflict because plaintiffs who bought and sold stock within the class period (called "in/out plaintiffs") have an interest in maximizing the amount of the purchase price and minimizing the amount of the sale price, whereas plaintiffs who purchased stock on the same day as the in/out plaintiffs sold their stock, have an opposite interest in inflating the purchase price. Consequently, every dollar of damage for an in/out plaintiff is one less dollar of damage for any plaintiff who purchased on the same day that the in/out plaintiff sold his stock.

Plaintiffs deny that irreconcilable conflicts between Class Members should prevent class certification. First, the Ninth Circuit rejected the same argument that Defendants are trying to raise in this case. Second, such conflicts are factually intensive, thus they cannot bar the motion for class certification until after significant discovery.

### B. Analysis

▉▉▉▉ In determining whether to certify a class under Rule 23(b)(3), a two-step

---

**17.** Though the Form 10–Q was publicly filed on May 15, 1995, at oral argument, Defendants explained that there may be a small amount of time before the information in the Form 10–Q was assimilated by the market, thus the Class Period should end on the day after the filing.

procedure must be followed. First, Plaintiffs must establish that the following four requirements of Rule 23(a) are met:

> (1) **[Numerosity]** the class is so numerous that joinder of all members is impracticable, (2) **[Commonality]** there are questions of law or fact common to the class, (3) **[Typicality]** the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) **[Adequacy of Representation]** the representative parties will fairly and adequately protect the interests of the class.

Second, Rule 23(b)(3) adds further criteria:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: * * * (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:
>
> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;
>
> (D) the difficulties likely to be encountered in the management of a class action.

Plaintiffs bear the burden of establishing each requirement under Rule 23 for class certification. *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 162, 102 S.Ct. 2364, 2373, 72 L.Ed.2d 740 (1982); *In re Northern Dist. of Calif., Dalkon Shield IUD Products Liability Litigation*, 693 F.2d 847, 854 (9th Cir.1982), *cert. denied*, 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). In ruling on a motion to certify, the court accepts as true the allegations made in support of certification, and does not consider the merits of the case. *Guenther v. Pacific Telecom, Inc.*, 123 F.R.D. 333, 335 (D.Or. 1988).

Plaintiffs propose that the class period begin on October 19, 1993 when L–P announced its "record" third quarter results without disclosing the known problems with its siding, to May 25, 1995 which is the day when the siding problems were printed in the *Wall Street Journal.* The proposed Class Members include individuals "who relied on the integrity of the market price for the securities, purchased the securities at these artificially inflated prices and were damaged thereby." The Class Representatives include eight persons who each purchased between 100 and 2,000 shares of L–P stock during the class period, which collectively amounted to 4,791 shares.

Plaintiffs argue that they have satisfied the requirements under Fed.R.Civ.Pro. 23 of numerosity, commonality, typicality, and adequacy of representation. Each requirement is addressed briefly in turn.

### 1. Numerosity

 Though Plaintiffs do not allege an exact number of Class Members, they claim that 109,459,809 outstanding shares suggest that the members number in the many thousands. Plaintiffs need not be able to identify all Class Members, so long as there are enough to make joinder impracticable. *Welling v. Alexy*, 155 F.R.D. 654, 656 (N.D.Cal. 1994) (satisfied numerosity requirement by showing that 25 million shares were outstanding during the class period). Defendants do not dispute that this first requirement is met.

### 2. Commonality

 Plaintiffs invoke the "fraud on the market" theory as the basis of their lawsuit. They allege that Defendants damaged Plaintiffs by multiple public misrepresentations regarding the financial health of both the Company and OSB siding. Where "a class of purchasers [are] allegedly defrauded over a period of time by similar misrepresentations * * *," the commonality requirement is satisfied. *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Guenther*, 123 F.R.D. at 336. As

discussed in Defendants' Motions to Dismiss, Plaintiffs have alleged numerous public misrepresentations which defrauded and injured the investing market, as a whole. Furthermore, though Defendants dispute the appropriate date on which the class members no longer shared commonality (an issue which is discussed below), they do not argue that this requirement is not satisfied. Accordingly, I find that the commonality prong of Rule 23(a) is met.

### 3. Typicality

 " 'The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class.' " *Welling*, 155 F.R.D. 654, 657 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992)). "The test 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " *Welling* at 657 (quoting *Hanon* at 508).

 Like all the Class Members, the Class Representatives seek to recover damages resulting from Defendants' alleged misrepresentations to the stock market regarding the financial health of L–P and the success of OSB siding. Defendants do not contend that the Class Representatives assert atypical claims. Moreover, there is no indication that the Class Representatives may be subject to unique defenses. *See e.g., Hanon*, 976 F.2d 497, 508 (9th Cir. 1992) ("We agree that a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." (internal quotations omitted)). Accordingly, I find that Plaintiffs have alleged sufficient facts demonstrating that their claims are typical with the rest of the class. Thus, the third requirement of typicality is satisfied.

### 4. Adequacy of Representation

 " 'The adequacy * * * requirement of Rule 23 is comprised of two factors: (1) that the representative party's attorney be qualified, experienced and generally able to conduct the litigation; and (2) that the suit not be collusive and plaintiff's interests not be antagonistic to those of the remainder of the class.' " *Welling*, 155 F.R.D. at 657 (quoting *In re United Energy Corp.*, 122 F.R.D. 251, 257 (C.D.Cal.1988)); *see also Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 1359, 128 L.Ed.2d 33 (1994); *Guenther*, 123 F.R.D. at 339. " 'In determining adequacy, the court must scrutinize the ability of the named representatives to represent the interest of the class fairly and adequately.' " *Welling* at 657 (quoting *United Energy* at 257)).

 Defendants do not challenge the adequacy of Plaintiffs' counsel and there is no evidence indicating that counsel is unable to competently conduct the proposed litigation. In fact, at oral argument, counsel for all parties displayed an extremely high level of expertise. Because Plaintiffs have satisfied the fourth element of adequacy of representation, all requirements of Rule 23(a) are met.

### 5. Predominance and Superiority

 Having established all of the Rule 23(a) prerequisites, Plaintiffs must also show under Rule 23(b)(3) that (1) questions of law or fact common to the Class Members predominate over questions affecting individual members, and (2) the class action is superior to other available methods of adjudication. *In re Northern Dist. of Cal., Dalkon Shield, etc.*, 693 F.2d at 855 (citing Fed.R.Civ.Pro. 23(b)(3)). These additional requirements are referred to as predominance and superiority, respectively.

 As discussed above, because Plaintiffs assert a "fraud on the market" theory, the following common questions of law and fact pervade the class: (1) whether Defendants' public representations or omissions were materially misleading, (2) whether Defendants made materially misleading statements with intent, and (3) whether reasonable investors had inquiry notice of the alleged fraud more than one year prior

to filing this lawsuit. Multiple issues predominate throughout the class, therefore this part of the test is satisfied. *See Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 252 (D.N.J.1992) (" 'In cases involving securities fraud, * * * predominance may be found if the defendant's challenged activities stem from a single, class-wide course of conduct, so that the issue of statutory liability is common to the class * * *.' " (quoting Friedenthal, Kane, Miller, CIVIL PROCEDURE at 735 (1985)).

Similarly, the superiority requirement of 23(b)(3) is also easily met in this case, as courts have consistently embraced the class action device as a superior method of adjudicating federal securities fraud claims. *See Basic*, 485 U.S. at 250, 108 S.Ct. at 993; *Blackie*, 524 F.2d at 903. The Class Members seek a determination on essentially the same issues, therefore, a class action would enhance judicial economy and efficiency. *See Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.1985) (effectiveness of securities laws depend in large part on enforcement through class actions), *cert. denied sub nom.*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985).

However, in opposition, Defendants argue that seller/purchaser conflicts among the Class Members should preclude class certification. Specifically, Defendants assert that Class Members who purchased stock on the same day as other Class Members who sold stock will have conflicting interests when proving damages because the seller wishes to prove that the stock price was depressed while the purchaser wishes to show that the stock price was inflated. *See In re Seagate Tech. II Sec. Litig.*, 843 F.Supp. 1341 (N.D.Cal.1994).[18] However, as Judge Walker recognized in *Seagate II*, this argument "has been raised by defendants in numerous courts, usually to no avail." *Id.* at 1359. For instance, in *Blackie v. Barrack*, 524 F.2d 891, 908–910 (9th Cir.1975), the Ninth Circuit rejected the same argument:

> Defendants' final major argument is that conflicts among class members preclude class certification. They contend that the interests of class members in proving damages from price inflation (and hence the existence and materiality of misrepresentations subsumed in proving inflation) irreconcilably conflict, because some class members will desire to maximize the inflation existing on a given date while others will desire to minimize it. For example, they posit that a purchaser early in the class period who later sells will desire to maximize the deflation due to an intervening corrective disclosure in order to maximize his out of pocket damages, but in so doing will conflict with his purchaser, who is interested in maximizing the inflation in the price he pays. We agree that class members might at some point during this litigation have differing interests. We altogether disagree, for a spate of reasons, that such potential conflicts afford a valid reason at this time for refusing to certify the class.

\* \* \* \* \* \*

**18.** In *Seagate II*, Judge Walker discussed the calculation for determining the out-of-pocket measure of damages for a defrauded investor. "This measure of damages looks to plaintiff's loss as opposed to the gain of defendant." *Id.* at 1347. The judge distinguished two types of plaintiffs: "there are potentially two types of plaintiffs—those who suffered 'retention' damages and those who suffered 'in/out' damages. Retention damages arise where a plaintiff purchased securities during the period of inflation, and then held the securities throughout the remainder of the class period." In/out damages, on the other hand, arise where the plaintiff purchases a number of securities during the price inflation, but then also sells all of those securities before the end of the class period." *Id.* at 1348. Because the damages are determined by the amount of price inflation, there are two forms of conflict in the class, as identified by Judge Walk-

er: "First, there is likely to arise a conflict between those in/out traders who sold securities on a particular day, and those plaintiffs who purchased on that same day. Second, there may be conflicting interests between those persons who still hold some of the relevant securities on the date of suit, and those who have divested themselves of all such holdings." *Id.* at 1359. The most serious conflict exists between the in/out plaintiff and retention plaintiff: "the in/out plaintiff's interest lies in minimizing the degree of price inflation existing at the date of sale. A retention plaintiff buying on that date (or, for that matter, another in/out plaintiff buying on that date) has an exactly opposite interest; *i.e.*, such a person would seek to maximize the degree of price inflation existing on that date. In other words, different plaintiffs have conflicting incentives in shaping the evidence." *Id.*

Here, the conflict, if any, is peripheral, and substantially outweighed by the class members' common interests. * * * Every class member shares an overriding common interest in establishing the existence and materiality of misrepresentations. The major portion of the inflation alleged is attributed to causes which allegedly persisted throughout the class period. It will be in the interest of each class member to maximize the inflation from those causes at every point in the class period, both to demonstrate the sine qua non liability and to maximize his own potential damages the more the stock is inflated, the more every class member stands to recover. Moreover, because the major portion of the inflation is attributed to causes persisting throughout the period, interim corrective disclosures (of which there appear to have been only two or three) do not necessarily bring predisclosure purchasers into conflict with post-disclosure purchasers. Because both share an interest in maximizing overall inflation, the latter purchaser will no doubt strive to show a substantial market effect from disclosure of the lesser (or partial) causes of inflation to maximize the inflation attributable to more serious causes persisting when he bought a showing which will increase the recovery of the earlier purchaser. In that light, any conflicting interests in tracing fluctuations in inflation during the class period are secondary, and do not bar class litigation to advance predominantly common interests.

In conformance with *Blackie,* Judge Marsh from this Court also rejected the seller/purchaser conflict: "This 'conflict' does not does not preclude a finding of typicality [because] [a]ny differences in the proof of damages is 'peripheral, and substantially outweighed by the class members' common interests.'" *Guenther,* 123 F.R.D. at 337 (quoting *Blackie* at 909); *see also* Fed.R.Civ.Pro. 23 Advisory Committee's Notes ("[A] fraud perpetrated on numerous persons [through] similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need * * * for separate determi-

nation of the damages suffered by the individual within the class.")

Similarly, in rejecting Judge Walker's reasoning in *Seagate II,* the district court in *Welling* explained that the presence of both in/out and retention traders do not destroy typicality because "in/out traders suffer damages under the fraud-on-the-market theory as do other types of traders," (citing *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1437 (9th Cir.1987), and class certification does not require uniformity of damages. *Welling,* 155 F.R.D. at 661–63. Lastly, several unpublished district court opinions from this Circuit have also expressly declined to follow *Seagate II. See In re AST Research Securities Litigation,* 1994 WL 722888, at *4 (C.D.Cal. Nov. 8, 1994); *Yamner v. Boich,* 1994 WL 514035, at *7–8 (N.D.Cal. Sept. 15, 1994); *In re Scorpion Technologies, Inc.,* 1994 WL 774029, at *4 (N.D.Cal. Aug. 10, 1994); *In re Proxima Securities Litigation,* 1994 WL 374306, at *18–19 (S.D.Cal. May 4, 1994).[19]

Likewise, I am not persuaded by Defendants' argument that conflicts between in/out and retention plaintiffs should prevent class certification. Accordingly, I find that Plaintiffs have satisfied the superiority prong of Rule 23(b)(3), and thus have met all requirements necessary for class certification.

**6. End Date For Class Period**

Numerous courts have held that in a securities class action based on material misrepresentation and omissions to the investing public "'the class period should end when curative information is publicly or otherwise effectively disseminated to the market.'" *Simpson v. Specialty Retail Concepts,* 149 F.R.D. 94, 103 (M.D.N.C.1993) (quoting *In re Kirschner Medical Corp. Sec. Litig.,* 139 F.R.D. 74, 82 (D.Md.1991) (citations omitted)); *Lerch,* 144 F.R.D. at 253 (quoting *In re Data Access Systems Sec. Litig.,* 103 F.R.D. 130, 143 (D.N.J.1984) (citing *McFarland v. Memorex Corp.,* 96 F.R.D. 357, 364 (N.D.Cal.1982)). "At that point, subsequent

**19.** Though these district court opinions have no precedential value, they do illustrate the trend of

district courts in the Ninth Circuit.

purchasers are charged with knowledge of the true state of business affairs, and thus common questions of law or fact arising from the misrepresentations or omissions do not predominate as to those subsequent purchasers, who are therefore excluded from the class." *Kirschner,* 139 F.R.D. at 82.

Consequently, the issue is whether the disclosure made it unreasonable for Class Members to continue relying on the alleged misrepresentations. *In re ORFA Sec. Litig.,* 654 F.Supp. 1449, 1465 (D.N.J.1987). "Where the parties dispute the curative effect of a release, such as here, the court should determine whether there is a 'substantial question of fact as to whether the release had cured the market or was itself misleading.'" *Simpson,* 149 F.R.D. at 103 (quoting *Kirschner,* 139 F.R.D. at 82). "If a substantial question exists, then the broader time for the class period should be certified." *Id.*

In their briefs and at oral argument, Defendants vigorously argued that in an efficient market such as the New York Stock Exchange, public information released through SEC Form 10–Q filings is assimilated by the market nearly instantaneously. Therefore, the Class Period must end no later than the day after L–P filed its Form 10–Q on May 15, 1995 in which L–P disclosed all the information that was merely reprinted in the May 25, 1995 *Wall Street Journal* article.

This argument is appealing because (1) the "fraud on the market" theory is based on the assumption that information which is publicly disclosed in an efficient market directly impacts the price of the stock, and (2) Plaintiffs, themselves, used SEC filings to show that Defendants made public statements which caused the L–P stock to become artificially inflated throughout the class period. However, now Plaintiffs contend that the efficient market did not respond to L–P's May 15, 1995 Form 10–Q until ten days later, on May 25, 1995, as evidenced by the sharp decline in the stock price on May 25, 1995.

Despite the apparent inconsistency of Plaintiffs' position, both parties submit testimony from experts who make opposite conclusions: Defendants' expert states that an efficient market like the NYSE must have assimilated the public disclosure in the May 15, 1995 Form 10–Q no later than May 16, 1995, *see* Stillman Decla.; but Plaintiffs' expert contends that the market only reacted to the May 25, 1995 *Wall Street Journal* article, *see* Roberts Decla. Likewise, at oral argument, the parties disputed whether the market, in fact, reacted in any way to the May 15, 1995 filing.

Because there is a substantial controversy over when the information was effectively assimilated by the market, which is the same moment when an investor could no longer reasonably rely on L–P's alleged misrepresentations, I will certify the Class Period until May 24, 1995. However, the Court retains the discretion to "redefine the contours of the class should that become necessary." *Data Access Systems,* 103 F.R.D. at 147.

## CONCLUSION

Defendants' Motions to Strike and Dismiss (# 41, # 43, # 52, # 58) are GRANTED IN PART and DENIED IN PART. The following claims and allegations are dismissed or stricken from the Complaint:

(1) paragraphs 76, 80, 91, 101 which allege statements made by stock analysts are DISMISSED WITH PREJUDICE, but the allegations shall remain in the Complaint;

(2) the language "a common enterprise or common course of" from paragraph 32 which alleges a conspiracy is STRICKEN; and,

(3) paragraph 29 which alleges a legal conclusion regarding L–P's duty to disclose is STRICKEN.

Furthermore, Plaintiffs' Motion for Class Certification (# 45) is GRANTED, thus the Class Period shall start on October 19, 1993 and end on May 24, 1995. IT IS SO ORDERED.